**[J-20-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| PUNXSUTAWNEY HUNTING CLUB, INC., AND PITCH PINE HUNTING CLUB, INC., | : No. 23 WAP 2023 |
| | : |
| Appellants | : Appeal from The Order of the Commonwealth Court entered September 29, 2023, at No. 456 MD 2021. |
| v. | : |
| | : ARGUED: April 9, 2025 |
| PENNSYLVANIA GAME COMMISSION, AND MARK GRITZER, IN HIS OFFICIAL CAPACITY AS AN OFFICER OF THE PENNSYLVANIA GAME COMMISSION, | : |
| | : |
| Appellees | : |

**OPINION**

**JUSTICE BROBSON**                                    **DECIDED: JULY 21, 2026**

Open fields are afforded no constitutional protection from warrantless searches and seizure under the Fourth Amendment to the United States Constitution.[1] In, *Commonwealth v. Russo*, 934 A.2d 1199 (Pa. 2007), this Court held that the protections

---

[1] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

afforded under Article I, Section 8 of the Pennsylvania Constitution[2] also do not extend to open fields. In this appeal, we reexamine our decision in *Russo* in the context of a constitutional challenge to portions of the Game and Wildlife Code (Code),[3] which expressly empower officials of the Pennsylvania Game Commission (Commission) to go upon or enter private property, posted or otherwise, in the exercise of their powers and duties under the Code (Entry Statutes).

For the reasons that follow, we conclude that slavish adherence to our decision in *Russo* must give way to the greater privacy and property protections afforded under Article I, Section 8 of our state charter. As our jurisprudence in this area has evolved, the Court's reasoning and result in *Russo* have not aged well. In short, we hold that: (a) *Russo* was wrongly decided; (b) Article I, Section 8 of the Pennsylvania Constitution affords greater protection to land beyond the curtilage of a home or building; and (c) most of the challenged Entry Statutes are, consequently, unconstitutional.

## I. BACKGROUND

### A. *Russo* and the Entry Statutes

#### i. Russo

In *Russo*, this Court examined whether, under Article I, Section 8, "a landowner has a reasonable expectation of privacy against enforcement of . . . [the] Code in his open fields." *Russo*, 934 A.2d at 1200. There, the appellant, Joseph Russo (Russo), killed a

---

[2] Article I, Section 8 provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. I, § 8.

[3] 34 Pa. C.S. §§ 101-2965.

bear on his private, wooded property in Wyoming County, approximately nine minutes after the opening of Pennsylvania's bear-hunting season. *Id.* After Russo transferred the bear to the Commission's nearby station for examination and tagging, the Commission received a tip that Russo's hunting camp had been "baited" in violation of Section 2308(a)(8) of the Code, 34 Pa. C.S. § 2308(a)(8).[4] *Id.* Several Commission officers entered Russo's property, which was posted with "[n]o [t]respassing" signs, without a warrant and found several large piles of "apple mash" as well as a corn feeder close to Russo's cabin. *Id.* at 1201. The officers also noticed a large indentation in the apple mash consistent with a bear having lain there, a clearly identifiable paw print, leaves containing blood droplets, and other evidence indicating that a bear had eaten at the bait piles located on Russo's property. *Id.* Certain officers also proceeded to Russo's residence located in Luzerne County, where they "observed a dead black bear carcass hanging from a piece of construction equipment." *Id.* The officers seized various items of evidence from both locations, which demonstrated that "all the blood and tissue recovered by the officers in the course of their investigation came from the bear whose carcass was seized at [Russo's] residence." *Id.* at 1202.

Based on the foregoing, the Commonwealth charged Russo with, *inter alia*, a violation of Section 2308(a)(8) of the Code. *Id.* Prior to trial,[5] Russo filed a motion to

---

[4] Section 2308(a)(8) of the Code provides, in pertinent part:

> [I]t is unlawful for any person to hunt or aid, abet, assist or conspire to hunt any game or wildlife through the use of . . . [a]ny artificial or natural bait, hay, grain, fruit, nut, salt, chemical, mineral or other food as an enticement for game or wildlife, regardless of kind and quantity, or take advantage of any such area or food or bait prior to 30 days after the removal of such material and its residue.

34 Pa. C.S. § 2308(a)(8).

[5] A district judge initially found Russo guilty, but Russo appealed to the Court of Common Pleas of Wyoming County (trial court), before which he received a *de novo* trial.

suppress the evidence seized by the Commission officers on the basis that the warrantless entry onto and search of his property violated Article I, Section 8. *Id.* The trial court denied the motion, finding that, based upon the officers' testimony and the photographic evidence presented, the bait piles were not within the curtilage of Russo's cabin and, therefore, the warrantless search of Russo's fields, where the bait piles were found, was lawful. *Id.* The trial court ultimately convicted Russo, and Russo appealed to the Commonwealth Court, challenging the denial of his suppression motion. *Id.* A three-judge panel of the Commonwealth Court unanimously affirmed, concluding that Russo "did not have a reasonable expectation of privacy in the property upon which the bait piles were found" under Article I, Section 8. *Id.* In so doing, the Commonwealth Court rejected Russo's argument that the "[n]o [t]respassing" signs created a reasonable expectation of privacy, explaining that a person does not commit a trespass when he is privileged to enter a particular property and Section 901(a)(2) of the Code specifically authorized the officers to enter Russo's posted property to perform their duties. *Id.* at 1202-03.

Russo filed a petition for allowance of appeal, which this Court granted to consider whether Section 901(a)(2) of the Code is unconstitutional as a violation of Article I, Section 8—*i.e.*, whether a landowner has a reasonable expectation of privacy on his posted property. *Id.* at 1203. This Court began its analysis of that issue by explaining that the open fields doctrine was first recognized by the United States Supreme Court (Supreme Court) in *Hester v. United States*, 265 U.S. 57 (1924), wherein Justice Oliver Wendell Holmes, Jr., writing for a unanimous Supreme Court, concluded that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers[,] and effects,' is not extended to the open fields. The distinction between the

latter and the house is as old as the common law." *Id.* at 1203-04 (quoting *Hester*, 265 U.S. at 59).

This Court then discussed the Supreme Court's six-to-three decision in *Oliver v. United States*, 466 U.S. 170 (1984), which reaffirmed "the vitality of the open fields doctrine as announced in *Hester*." *Id.* at 1204 (quoting *Oliver*, 466 U.S. at 178). In *Oliver*, the Supreme Court, "[t]urning its attention initially to the constitutional text," held "that open fields are not 'effects' within the meaning of the Fourth Amendment." *Id.* Rather, the Supreme Court observed, the framers of the Fourth Amendment "would have understood the term 'effects' to be limited to personal, rather than real, property." *Id.* (quoting *Oliver*, 466 U.S. at 177 n.7). The Supreme Court went on to reason that, even if "one had a subjective expectation of privacy in his open fields," society would not be prepared to recognize such an expectation as reasonable:

> [O]pen fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter[,] these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or "[n]o [t]respassing" signs effectively bar the public from viewing open fields in rural areas. And both petitioner . . . and respondent . . . concede that the public and police lawfully may survey lands from the air.

*Id.* (first alteration in original) (quoting *Oliver*, 466 U.S. at 179). The Supreme Court also "explicitly rejected the contention that the reasonableness of one's expectation of privacy in his open fields should be determined on an *ad hoc*, case-by-case basis" because it would be unworkable. *Id.*

Turning back to the case before it, this Court reasoned that, pursuant to *Oliver*, there was no question that the Commission officers' search of Russo's property was lawful under the Fourth Amendment. *Id.* at 1205. "The issue," this Court explained, was "whether Pennsylvania has departed, or should depart, from [the open fields] doctrine

when applying Article I, Section 8." *Id*. Thus, this Court observed that "[t]o determine whether the open fields doctrine as enunciated in *Oliver* is consonant with Article I, Section 8, [it would] undertake an independent analysis of that provision as guided by [this Court's] seminal decision" in *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991). *Id*. This Court explained that, "[u]nder *Edmunds*, a principled consideration of state constitutional doctrine should include an examination of: (1) the text of the provision of [Pennsylvania's] Constitution; (2) the history of the provision, including the case[ ]law of this Commonwealth; (3) relevant case[ ]law from other jurisdictions; and (4) policy considerations, 'including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.'" *Id*. (quoting *Edmunds*, 586 A.2d at 895).

As to the text of Article I, Section 8, this Court explained that, given its similarity to the text of the Fourth Amendment, "it [was] not surprising that [Russo] fail[ed] to make any textually based arguments for departing from the federal open fields doctrine." *Id*. On that point, this Court explained that Article I, Section 8's use of the term "possessions" is similar to the Fourth Amendment's use of the term "effects:"

> Like the word "effects" . . . , "possessions" appears as the last among four objects in which the people have a right to be secure, the others being their "persons," "houses," and "papers." Pursuant to the interpretative doctrine of *ejusdem generis*, the term "possessions" should be construed in light of the particular words preceding it, all of which refer to intimate things about one's person. If "possessions" had been intended to refer to everything one owned, such as open fields, then there would have been no need to specify the other three objects. We therefore find persuasive for present purposes the *Oliver* Court's interpretation of the text of the Fourth Amendment. Nothing in the plain text of Article I, Section 8 suggests that open fields are entitled to the same degree of privacy as one's person, house, papers, and possessions.

*Id*. at 1205-06 (footnote omitted).

With respect to the second *Edmunds* factor—*i.e.*, the history of Article I, Section 8—this Court first addressed Russo's observation that Article I, Section 8

provides greater privacy protection than the Fourth Amendment under certain, limited circumstances. *Id*. at 1206 (citing *Commonwealth v. Shaw*, 770 A.2d 295, 299 (Pa. 2001) (holding that warrant is required to release hospital-administered blood-alcohol content test results to police under Article I, Section 8, even though it is not under Fourth Amendment); *Commonwealth v. Matos*, 672 A.2d 769, 771, 776 (Pa. 1996) (holding that police pursuit of individual constitutes "seizure" under Article I, Section 8, even though it does not under Fourth Amendment); *Commonwealth v. White*, 669 A.2d 896, 902 (Pa. 1995) (holding that warrantless search of vehicle incident to arrest is not permissible under Article I, Section 8, even though it is under Fourth Amendment)). This Court noted, however, that Russo failed to explain how his particular circumstances implicated the heightened privacy interest recognized in those contexts or to reference a case that was even remotely analogous. *Id*. at 1206-07. Further, this Court pointed to several decisions where it held that Article I, Section 8 does *not* provide greater protection than the Fourth Amendment. *Id.* at 1207 (citing, *inter alia*, *Commonwealth v. Duncan*, 817 A.2d 455, 469 (Pa. 2003) (holding that police request for person's name and address does not implicate privacy rights under Article I, Section 8); *Commonwealth v. Glass*, 754 A.2d 655, 665 (Pa. 2000) (holding that anticipatory search warrants do not *per se* violate Article I, Section 8); *Commonwealth v. Cleckley*, 738 A.2d 427, 433 (Pa. 1999) (holding that police do not have to inform suspect of voluntariness of consent for search to be valid under Article I, Section 8); *Commonwealth v. Waltson*, 724 A.2d 289, 293 (Pa. 1998) (holding that, where probable cause exists to believe contraband is located within particular room of single-unit house, Article I, Section 8 does not preclude search of entire residence); *Commonwealth v. Williams*, 692 A.2d 1031, 1038-39 (Pa. 1997) (holding that warrantless search of defendant's bedroom by parole officer did not violate Article I, Section 8)).

Continuing, this Court explained that the exclusionary rule "was not an organic part of Article I, Section 8" but, rather, was made applicable to Pennsylvania for Fourth Amendment purposes by *Mapp v. Ohio*, 367 U.S. 643 (1961). *Id.* Prior to *Mapp*, Pennsylvania adhered to "the fundamental principle of the common law that the admissibility of evidence [was] not affected by the illegality of the means by which it was obtained." *Id*. (quoting *Commonwealth v. Chaitt*, 112 A.2d 379, 381 & n.1 (Pa. 1955)). "Thus," this Court observed, "any historical survey respecting open fields and privacy under Article I, Section 8, like examination of any suppression case under the Pennsylvania charter, hit[] a brick wall in 1961: there [was] no relevant history to support a broader state constitutional interpretation because there was no point in seeking such an interpretation, at least in a criminal case, since there was no exclusionary remedy available." *Id*. (emphasis omitted). Eventually, exclusionary decisions arose solely under Article I, Section 8 and, in some cases, those decisions embraced "a greater protection of privacy rights than that which was commanded under the Fourth Amendment and *Mapp*." *Id*. at 1208. This Court clarified, however, that "no decision of this Court [had] squarely purported to examine and disapprove of the long and unbroken line of pre-*Mapp* decisions holding that, far from recognizing greater exclusionary-rule-related privacy rights, Article I, Section 8 contained no exclusionary remedy whatsoever." *Id*. (emphasis omitted).

What was most important to the *Russo* Court's analysis was that Pennsylvania's "own unique history and case[ ]law simply [did] not reflect any 'societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields'" because those lands are readily accessible to the public and law enforcement. *Id*. at 1209 (quoting *Oliver*, 466 U.S. at 179). Therefore, this Court reasoned that "open fields do not provide the setting for the kinds of intimate activities

with respect to which citizens would reasonably expect to be free from governmental surveillance" under Article I, Section 8. *Id*. In support, this Court referenced three Pennsylvania decisions: *Commonwealth v. Rood*, 686 A.2d 442, 450 (Pa. Cmwlth. 1996) (en banc) (holding that landowner had no reasonable expectation of privacy under Article I, Section 8 in wooded area located beyond curtilage of home), *appeal denied*, 699 A.2d 736 (Pa. 1997); *Commonwealth v. Treftz*, 351 A.2d 265, 270 (Pa. 1976) (holding that defendant lacked standing under Article I, Section 8 to challenge validity of seizure of murder victim's corpse found in backwoods area of property); and *Commonwealth v. Bender*, 811 A.2d 1016, 1023 (Pa. Super. 2002) (rejecting Article I, Section 8 challenge to admissibility of tape-recorded conversation made in vehicle parked on defendant's property). *Id.* at 1209-10. Thus, although Russo provided an apt description of the unique history of Article I, Section 8, this Court concluded that Russo failed to "relate that unique history to the specific question of the reasonableness of an expectation of privacy in one's open fields." *Id*. at 1210. This Court explained that "[t]he mere fact that this Court has, under certain circumstances, accorded greater protections to the citizens of this Commonwealth under Article I, Section 8 'does not command a reflexive finding in favor of any new right or interpretation asserted. To the contrary, [this Court] should apply the prevailing standard where [its] own independent state analysis does not suggest a distinct standard.'" *Id*. (quoting *Glass*, 754 A.2d at 660). "[I]n short," this Court explained, "Pennsylvania history . . . weighs strongly against any notion that open fields are entitled to the same heightened privacy as one's person or home." *Id*.

As to the third *Edmunds* factor—*i.e.*, relevant case law from other jurisdictions—this Court discussed the four decisions that Russo cited from other states that "refused to adopt the federal open fields doctrine for purposes of their constitutions:" *People v. Scott*, 593 N.E.2d 1328 (N.Y. 1992); *State v. Johnson*, 879 P.2d 984 (Wash. Ct. App. 1994);

*State v. Kirchoff*, 587 A.2d 988 (Vt. 1991); and *State v. Bullock*, 901 P.2d 61 (Mont. 1995). *Id*. at 1210-11. According to this Court, in *Scott*, the New York Court of Appeals held that a landowner has a privacy interest in land located beyond the curtilage under Article 1, Section 12 of the New York Constitution. *Id*. at 1210. This Court observed that the text of Article 1, Section 12 is substantially similar to the text of Article I, Section 8 in that it protects "effects" from unreasonable searches and seizures. *Id*. This Court, nonetheless, explained that the *Scott* court "expressly disavowed 'the *Oliver* majority's . . . literal textual analysis,' instead[,] preferring to focus on the compatibility of the federal open fields doctrine with New York case[ ]law." *Id*. (first alteration in original) (quoting *Scott*, 593 N.E.2d at 1335). Because New York case law differed from Pennsylvania case law, particularly with regard to trespass statutes, this Court reasoned that *Scott* did not provide support for Russo's position. *Id.*

This Court explained that, similarly, in *Johnson*, *Kirchoff*, and *Bullock*, the Washington Court of Appeals, the Vermont Supreme Court, and the Montana Supreme Court all determined that the open fields doctrine was incompatible with their respective state constitutions. *Id.* at 1211. This Court noted, however, that, in *Johnson* and *Kirchoff*, "the relevant general inquiry under [Washington's and Vermont's] constitutions was not, as under the Fourth Amendment, the reasonableness of one's privacy expectation." *Id.* Rather, the critical inquiry in *Johnson* focused on whether a law enforcement officer unreasonably intruded into the defendant's private affairs, and, in *Kirchoff*, the court expressed reluctance "to use the phrase 'reasonable expectation of privacy.'" *Id.* (quoting *Kirchoff*, 587 A.2d at 995). This Court further explained that Article II, Section 10 of the Montana Constitution contains an additional enumerated protection of privacy not found in the Fourth Amendment or Article I, Section 8. *Id.* (citing Mont. Const. art. II, § 10 ("The right of individual privacy is essential to the well-being of a free society and shall not be

infringed without the showing of a compelling state interest.")).  Accordingly, this Court concluded that the decisions from states that have adopted the federal open fields doctrine were more persuasive than *Scott*, *Johnson*, *Kirchoff*, and *Bullock* because the wording of the relevant constitutional provisions from those states is substantially similar to the language set forth in Article I, Section 8.  *Id.* at 1211-12 (citing *State v. Pinder*, 514 A.2d 1241, 1246 (N.H. 1986); *State v. Havlat*, 385 N.W.2d 436, 440 (Neb. 1986); *Williams v. State*, 166 N.E. 663 (Ind. 1929); *Wolf v. State*, 9 S.W.2d 350 (Tex. Crim. App. 1928); *State v. Zugras*, 267 S.W. 804, 806 (Mo. 1924); *Ratzell v. State*, 228 P. 166, 168 (Okla. Crim. App. 1924); *Brent v. Commonwealth*, 240 S.W. 45, 48 (Ky. 1922); *State v. Gates*, 703 A.2d 696, 701 (N.J. Super. Ct. Law Div. 1997); *Betchart v. Dep't of Fish & Game*, 205 Cal. Rptr. 135 (Cal. Ct. App. 1984)).

With respect to policy considerations—the last *Edmunds* factor—this Court explained that, according to Russo, the guarantees of Article I, Section 8 should extend to open fields in order to:  (1) prevent "fishing expeditions" by "overly zealous" law enforcement officers; (2) protect the right to privacy; (3) prevent the Commission's officers from treating others' property as their own; (4) avoid confrontations between the Commission's officers and landowners; and (5) encourage the Commission's officers to apply for search warrants.  *Id.* at 1212.  Disagreeing, this Court noted that "'[i]mplementation of a state constitutional value . . . necessarily entails a searching, evaluative inquiry' into genuinely 'unique state sources, content, and context as bases for independent interpretation.'"  *Id.* (alterations in original) (quoting Thomas G. Saylor, *Prophylaxis in Modern State Constitutionalism:  New Judicial Federalism and the Acknowledged Prophylactic Rule*, 59 N.Y.U. Ann. Surv. Am. L. 283, 309-13 (2003)).  This Court noted that Russo failed to explain how the "general principles of Pennsylvania law, decisions from other states, and [Pennsylvania's] trespass statute," upon which he relied

in support of his policy arguments, pertained to "unique issues of state and local concern, and [were applicable] within modern Pennsylvania jurisprudence." *Id*. (quoting *Edmunds*, 586 A.2d at 895). As such, this Court concluded that Russo's arguments fell short of the "searching inquiry required to determine that public policy considerations unique to Pennsylvania suggest that the federal open fields doctrine [was] inconsistent with Article I, Section 8." *Id.* Indeed, this Court observed:

> The citizens of this Commonwealth throughout our history have shown a keen interest in protecting and preserving as an asset the diverse wildlife that find refuge in the fields and forests within our borders. This interest is so strong that it is enshrined by a separate provision of the Pennsylvania Constitution[, which is commonly referred to as the Environmental Rights Amendment (ERA)]:
>
> > The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.
>
> P[a]. C[onst]. art. 1, § 27. The legislative and executive branches, in turn, have enacted and executed a plethora of statutes and regulations designed to enforce the people's right to the preservation of our wildlife. Thus, our Constitution and enacted statutes—as well as the agencies created to enforce them—all confirm that, in Pennsylvania, any subjective expectation of privacy against governmental intrusion in open fields is not an expectation that our society has ever been willing to recognize as reasonable. In short, the baseline protections of the Fourth Amendment, in this particular area, are compatible with Pennsylvania policy considerations insofar as they may be identified. More importantly, there is nothing in the unique Pennsylvania experience to suggest that we should innovate a departure from common law and from federal law and reject the open fields doctrine.

*Id.* at 1212-13 (footnote omitted).

Based on the foregoing, this Court concluded that the guarantees of Article I, Section 8 do not extend to open fields because "federal and state law, in this area, are coextensive." *Id*. at 1213. Consequently, this Court held that the Commission officers'

search of Russo's property did not violate his constitutional right to be free from unreasonable searches and seizures. *Id.*

Chief Justice Cappy authored a dissenting opinion, which then-Justice Baer and Justice Baldwin joined. In that opinion, Chief Justice Cappy "vigorously" disagreed with the majority that "application of the open fields doctrine [was consistent] with the protections afforded by Article I, Section 8," explaining:

> I would hold that Section 901(a)(2) [of the Code] is unconstitutional to the extent that it authorizes entry onto posted private property without any level of suspicion of illegal activity. I reach this conclusion because a constitutional rule which permits state agents to enter private land in outright disregard of the property owner's efforts to maintain privacy is one that offends the fundamental rights of Pennsylvania citizens.

*Id*. at 1213-14 (Cappy, C.J., dissenting).

Conducting his own *Edmunds* analysis and starting with the text, Chief Justice Cappy pointed out that this Court has previously afforded a broad interpretation to the term "possessions" by extending Article I, Section 8 protection to conversations conducted in one's home, telephone numbers accessible by a telephone company, and bank records. *Id*. at 1215 (citing *Commonwealth v. Brion*, 652 A.2d 287 (Pa. 1994); *Commonwealth v. Melilli*, 555 A.2d 1254 (Pa. 1989); *Commonwealth v. DeJohn*, 403 A.2d 1283 (Pa. 1979)). He reasoned that none of those "possessions" were consonant with the majority's narrow construction of Article I, Section 8 but this Court has, nevertheless, "afforded them protection under certain circumstances pursuant to the text of Article I, Section 8." *Id*. Chief Justice Cappy also pointed out that Article I, Section 8 provides that "no warrant to search '*any* place' or to seize '*any* person or things' shall issue without probable cause." *Id*. (emphasis in original). According to Chief Justice Cappy, "[t]his language, which does not appear in the Fourth Amendment, suggests that a property owner may possess a privacy interest in his land." *Id*. For those reasons, Chief Justice

Cappy would have interpreted "possessions," as set forth in Article I, Section 8, more broadly than "effects," as set forth in the Fourth Amendment. *Id*.

With respect to the history of Article I, Section 8, Chief Justice Cappy criticized the majority's reliance on a lack of precedent "suggest[ing] a reasonable expectation of privacy in open fields," noting that "[s]uch lack of precedent from this Court may arise from the fact that there has never been a case in which the particular issue was presented." *Id*. More importantly, Chief Justice Cappy explained that Article I, Section 8 has always been interpreted "to *embody a strong notion of privacy* that has been carefully safeguarded in this Commonwealth for the past two centuries, whereas *the sole purpose* for the exclusionary rule under the Fourth Amendment is to deter police misconduct." *Id*. (emphasis in original) (citation omitted). Consequently, Chief Justice Cappy would have interpreted Article I, Section 8's history "as encompassing a right of privacy in property that is posted in a manner as to reasonably indicate that entry is not permitted." *Id*.

As to precedent from other jurisdictions, Chief Justice Cappy found the Montana Supreme Court's decision in *Bullock* to be "particularly persuasive because it is based on an interest that Pennsylvania and Montana share—a high regard for privacy." *Id*. at 1216. He explained that Pennsylvania's "respect of privacy is equally [as] well-established [as Montana's,] as we have held that Article I, Section 8 embodies a strong notion of privacy that has been carefully safeguarded in this Commonwealth for centuries." *Id*. Accordingly, Chief Justice Cappy was persuaded by *Bullock*'s reasoning and "the decisions from those jurisdictions which have held that their state constitutions provide greater protection of citizens' privacy interests than that provided by the Fourth Amendment." *Id*.

With respect to the last *Edmunds* factor, Chief Justice Cappy reasoned that the policy considerations supporting the use of search warrants generally—*i.e.*, "to protect

citizens against unreasonable searches and seizures and . . . the right to be left alone"—supported a rejection of the open fields doctrine. *Id.* at 1217. He opined that recognizing such a privacy interest would not hinder law enforcement because the Commission's "officers could still search property that is not posted or fenced, could observe evidence of violations of the . . . Code in plain view, or could obtain a warrant to search citizens' private property upon receipt of information that a violation of the . . . Code has occurred." *Id.* Accordingly, while he appreciated the Commission's obligation to protect and preserve Pennsylvania's wildlife, Chief Justice Cappy would have found that "the delicate balance of competing interests falls on the side of protecting Pennsylvania citizens' privacy interests." *Id.* In other words, he found Russo's "policy considerations to be paramount." *Id.*

For all of these reasons, Chief Justice Cappy concluded that "the text of Article I, Section 8, its history in this Commonwealth, the related case law of other states, and the relevant policy considerations support[ed] constitutional protection of a . . . landowner's right to privacy when he or she has posted the property in a manner that indicates that entry is not permitted." *Id.* Consequently, Chief Justice Cappy would have held "that a citizen may claim privacy in an open field under Article I, Section 8 . . . when indicia would lead a reasonable person to conclude that the area is private" and that Section 901(a)(2) of the Code is, therefore, unconstitutional "to the extent that it authorizes entry onto posted private property without any level of suspicion of illegal activity." *Id.* Nonetheless, because the Commission officers had some level of suspicion when they entered Russo's property based on the anonymous tip concerning baiting and the fact that Russo shot a bear within minutes of the opening of bear hunting season, Chief Justice Cappy would have remanded the matter to the trial court to determine whether that suspicion was sufficient, independent of Section 901(a)(2), "to approach the door of [Russo's] cabin to

investigate allegations that the property was baited and to seize evidence obtained in plain view."[6]  *Id*.

### *ii. The Entry Statutes*

The Entry Statutes authorize the Commission's officers, employees, and representatives to enter private land outside of buildings and curtilage to inspect for violations of the Code.   Specifically, Section 303(c) of the Code, entitled "Game Commission officers and employees," provides:

> (c) Power and authority.--Every officer, employee or representative of the commission in the exercise of their powers and duties shall have the right and authority to go upon or enter any property, posted or otherwise, outside of buildings.

34 Pa. C.S. § 303(c).  Section 901(a)(2) and (8) of the Code, entitled "Powers and duties of enforcement officers," provides:

> (a) Powers.--Any officer whose duty it is to enforce this title or any officer investigating any alleged violation of this title shall have the power and duty to:
>
> . . . .
>
> (2) Go upon any land or water outside of buildings, except curtilage, posted or otherwise, in the performance of the officer's duty.
>
> . . . .
>
> (8) Conduct administrative inspections of persons, licenses and permits, firearms, ammunition and other implements of taking, game bags, game, meat poles, tags, clothing, waterfowl blinds, decoys, tree stands, immediate hunting locations, or any means of transportation or its attachments used as blinds or as hunting locations, and any coolers or containers possessed at a hunting location when prima facie evidence of hunting exists.  Any officer conducting an administrative inspection shall, if any person is

---

[6] Justice Baldwin also authored a dissenting opinion, which then-Justice Baer joined.  In that opinion, Justice Baldwin joined Chief Justice Cappy's "cogent dissenting opinion" but wrote separately to address a point that is not relevant to our decision today.

present, present a badge or other means of official identification and state the purpose of the inspection.

34 Pa. C.S. § 901(a)(2), (8).

## B. Factual and Procedural History

We now turn to the facts and circumstances of this case, which, given the procedural posture, the parties do not appear to dispute. Appellants Punxsutawney Hunting Club, Inc. (Punxsutawney), and Pitch Pine Hunting Club, Inc. (Pitch Pine) (collectively, Hunting Clubs), are private, member-owned hunting clubs that own 4,400 acres and 1,100 acres of contiguous land, respectively, in Clearfield County, Pennsylvania. The Hunting Clubs have houses (Punxsutawney has five, Pitch Pine has one), where members stay overnight or vacation for longer periods of time. Their properties include farm plots and woods with trail systems, where members and their friends and family can hunt, hike, ski, target shoot, or otherwise "find[] solitude in nature." (Reproduced Record (R.R.) at 99a-101a, 137a-38a.) The Hunting Clubs value and expect privacy on their land, emphasizing that "one of the core values" that their members receive is "a private place—a sanctuary—where they can come to escape from the hustle and bustle of daily life." (*Id.* at 100a-01a, 138a.) The Hunting Clubs' members "prefer hunting on [their] land because, unlike on public game lands, they can easily find spots where strangers will not unexpectedly walk in and spook nearby wildlife or accidentally step into their line of fire." (*Id*. at 102a, 139a.) The Hunting Clubs' members use their time "to have private conversations about personal topics that might not come up in daily life" and that "they would not feel comfortable discussing on public property where strangers could overhear them," such as "family matters, marital problems, work stressors, romantic feelings, and faith in God." (*Id.* at 101a, 138a-39a.)

To ensure their members' privacy, the Hunting Clubs have taken various measures to exclude intruders and non-members from their land. They have posted clearly visible

"no trespassing" signs and purple paint[7] along their property lines, installed locked gates at all public entrances, and fenced some parts of their boundaries with waist-high, metal wire. Punxsutawney, which has a public road running through its land, even planted evergreens along that road "to create a 'screen' to prevent non-members from looking or shooting into the property from the public road." (*Id.* at 104a.) The Hunting Clubs only grant permission to enter their land to their members, their members' guests, contractors who help maintain their properties, and a gas company that owns their land's subsurface mineral rights and accesses its well pads through a dedicated access trail.

Mark Gritzer (Warden Gritzer) works as a game warden for the Commission and is assigned to the district in which the Hunting Clubs' land is located. Since 2013, Warden Gritzer and other Commission officers have entered the Hunting Clubs' land without consent, a warrant, or probable cause at least 15 to 22 times to look for evidence of hunting offenses. Warden Gritzer even placed a trail camera on Punxsutawney's property in an attempt to develop probable cause for charges of illegal elk feeding. That camera remained on Punxsutawney's property for 78 days. On some occasions, Warden Gritzer has cited individuals for violations of the Code.

In light of the foregoing, the Hunting Clubs filed a petition for review in the nature of a complaint for declaratory and injunctive relief (Petition) in the Commonwealth Court's original jurisdiction against the Commission and Warden Gritzer. Therein, the Hunting Clubs claimed, *inter alia*, that their private land constitutes a "possession" under Article I, Section 8 and that the Commission's and Warden Gritzer's warrantless searches thereof violated their right to be free from unreasonable searches and seizures. Because the

---

[7] Pursuant to what is commonly referred to as the "Purple Paint Law," Pennsylvania landowners, except those in Philadelphia and Allegheny Counties, have the option to use purple paint, rather than "no trespassing" signs, to post their properties to alert others that trespassing is not permitted. *See* 18 Pa. C.S. § 3503(b)(1)(vi).

Commission's and Warden Gritzer's searches of their properties were conducted under the authority of the Entry Statutes, the Hunting Clubs further claimed that the Entry Statutes are unconstitutional under Article I, Section 8 "to the extent they allow nonconsensual warrantless searches of private land that is posted, gated, occupied, and used." (*Id.* at 39a.) In so doing, the Hunting Clubs acknowledged this Court's contrary ruling in *Russo* but, nonetheless, claimed that *Russo* was wrongly decided. By way of relief, the Hunting Clubs asked the Commonwealth Court to declare that the Entry Statutes, as well as the Commission's and Warden Gritzer's "policy and practice of nonconsensual warrantless searches of private land over which the owner has exercised control," violate Article I, Section 8 and to enter an order "permanently enjoining [the Commission and Warden Gritzer] from enforcing the . . . Entry Statutes by searching [the Hunting Clubs'] land or any other land over which the owner has exercised control, without consent or a warrant." (*Id*. at 42a.) The Commission and Warden Gritzer responded to the Petition by filing an answer with new matter, wherein they claimed, *inter alia*, that the Hunting Clubs' request for relief was barred by *Russo*, that Warden Gritzer was at all relevant times operating within the course and scope of his employment, and that the Commission's officers perform necessary functions in open fields in Pennsylvania.

Following a period of discovery, the parties filed cross-applications for summary relief, which put the purely legal questions presented in this matter squarely before the Commonwealth Court for its consideration. In an unpublished, memorandum opinion authored by Judge Wojcik, the Commonwealth Court, sitting *en banc*, concluded that it was bound by this Court's decision in *Russo*. *Punxsutawney Hunting Club, Inc. v. Pa. Game Comm'n* (Pa. Cmwlth., No. 456 M.D. 2021, filed Sept. 29, 2023), slip op. at 2, 9. Based upon *Russo*, the Entry Statutes are constitutional. *Id.*, slip op. at 9. The Commonwealth Court also declined to "express an advisory opinion on whether, barring

*Russo*," the Entry Statutes violate Article I, Section 8. *Id.* As a result, the Commonwealth Court granted the Commission and Warden Gritzer's application for summary relief, denied the Hunting Clubs' application for summary relief, and entered judgment in the Commission and Warden Gritzer's favor. *Id.*

Judge McCullough authored a concurring opinion, which Judge Wallace joined. *Id.*, slip op. at 1 (McCullough, J., concurring). Although acknowledging that the Commonwealth Court was bound by this Court's decision in *Russo*, Judge McCullough wrote separately to emphasize her agreement with Chief Justice Cappy's dissenting view in *Russo*.

## II. DISCUSSION

### A. Whether Principles of *Stare Decisis* Compel Adherence to *Russo*

"*Stare decisis* is 'a principle as old as the common law itself.'" *Commonwealth v. Alexander*, 243 A.3d 177, 195 (Pa. 2020) (quoting *Morrison Informatics, Inc. v. Members 1st Fed. Credit Union*, 139 A.3d 1241, 1249 (Pa. 2016) (Wecht, J., concurring)). "The basic legal principle of *stare decisis* generally commands judicial respect for prior decisions of this Court and the legal rules contained in those decisions." *Stilp v. Commonwealth*, 905 A.2d 918, 954 n.31 (Pa. 2006). As explained by the Supreme Court, "*stare decisis* promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Id.* (quoting *Randall v. Sorrell*, 548 U.S. 230, 243 (2006)). "[G]eneral faithfulness to precedent[, however,] is not sufficient justification to buttress judicial decisions proven wrong in principle." *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 352 (Pa. 2014). Indeed, this Court has "long recognized that the doctrine of *stare decisis* is not a vehicle for perpetuating error, but 'a legal concept which responds to the demands of justice and, thus, permits the orderly growth processes of the law to

flourish.'" *Id.* (quoting *Pa. State Ass'n of Cnty. Comm'rs v. Commonwealth*, 52 A.3d 1213, 1230 (Pa. 2012)). "No one would seriously maintain that *stare decisis* demands absolute fidelity to what came before." *Alexander*, 243 A.3d at 196.

Furthermore, "*stare decisis* 'is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions.'" *Id.* at 197 (quoting *Agostini v. Felton*, 521 U.S. 203, 235 (1997)). We, therefore, "are not constrained to closely and blindly re-affirm constitutional interpretations of prior decisions which have proven to be unworkable or badly reasoned." *Holt v. 2011 Legis. Reapportionment Comm'n*, 38 A.3d 711, 759 n.38 (Pa. 2012). Nevertheless, "[t]o ensure certainty and finality, overturning a decision requires a 'special justification, over and above the belief that the precedent was wrongly decided.'" *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 850 (Pa. 2024) (quoting *Alexander*, 243 A.3d at 196). When considering whether to overrule established precedent, this Court is guided by several factors: (1) the quality of the prior decision's reasoning; (2) the workability of the rule established by the prior decision; (3) the prior decision's consistency with other related decisions; (4) reliance on the prior decision; and (5) the age of the prior decision. *Alexander*, 243 A.3d at 196.

### i. Parties' Arguments

The Hunting Clubs argue that this Court should overrule *Russo*: "*Russo* was wrong the day it was decided, and *stare decisis* provides it no shield today." (Hunting Clubs' Br. at 38.) To that end, the Hunting Clubs, noting that *stare decisis* is at its weakest when we interpret the Pennsylvania Constitution, maintain that all four *stare decisis* factors—*i.e.*, the quality of the decision's reasoning; the workability of the rule established by the decision; the decision's consistency with other related decisions; and reliance on the decision—weigh in favor of overruling *Russo*.

As to the first *stare decisis* factor, the Hunting Clubs argue that *Russo* was poorly reasoned because the parties failed to properly brief the *Edmunds* factors. In that regard, the Hunting Clubs note that the Commonwealth failed to address *Edmunds* in its entirety and Russo failed to "make any textually based arguments for departing from the federal open fields doctrine," demonstrate how Article I, Section 8's history supports a "privacy [right] in one's open fields," or provide any discussion on how other states' constitutions that protect "possessions" define that term. (*Id.* at 39 (quoting *Russo*, 934 A.2d at 1205, 1210).) The Hunting Clubs explain that "state constitutional decisions are more secure when they proceed from a searching inquiry," as contemplated in *Edmunds*, and, therefore, "'it is important that litigants brief and analyze' all four of its factors." (*Id.* at 39, 40 (quoting *Russo*, 934 A.2d at 1208 n.11; *Edmunds*, 586 A.2d at 895).) The Hunting Clubs insist that the parties' failure in this regard impacted this Court's decision. Specifically, they highlight that this Court never discussed Pennsylvania's historical concern for privacy or how other states define the term "possessions" or attempted to provide a historical definition of that term; instead, this Court applied the *ejusdem generis*[8] canon of statutory construction, which, according to the Hunting Clubs, should only be used to resolve ambiguity in the statutory provision at issue. In the Hunting Clubs' view, this Court's textual analysis in *Russo* should have ended with the overwhelming evidence that the unambiguous meaning of the term "possessions" includes land and that this Court's "misuse of *ejusdem generis* produced a slew of downstream issues that could have been avoided:" (1) "using *ejusdem generis* to narrow the meaning of 'possessions' violates the canon that constitutional provisions for the security of person and property

---

[8] "Under our statutory construction doctrine *ejusdem generis* ('of the same kind or class'), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." *McClellan v. Health Maint. Org. of Pa.*, 686 A.2d 801, 806 (Pa. 1996).

should be liberally construed;" (2) this Court failed to explain why "possessions" must be "intimate" or "about one's person," when proximity was never before required, or "grapple with the countless intimate activities that occur on private land;" and (3) "*ejusdem generis* is supposed to ensure that a general word will not render specific words meaningless" and reading the term "possessions" to include land does not render "persons, houses, [or] papers" meaningless. (*Id.* at 42-43 (citations and internal quotation marks omitted).)

With respect to the workability factor, the Hunting Clubs contend that *Russo* is unworkable because it allows government officials to violate Article I, Section 8 across the Commonwealth. In support, the Hunting Clubs reference *Alexander*, wherein this Court rejected the federal automobile exception in favor of greater privacy under Article I, Section 8. (*See id.* at 44 (citing *Alexander*, 243 A.3d at 198 ("[W]e cannot ignore constitutional commands even if they make the work of police or prosecutors harder.")).) The Hunting Clubs argue that this Court cannot allow game wardens to treat all private land like public property even if it makes their jobs easier because "[Article I,] Section 8 was adopted to secure privacy, and the best way to secure privacy . . . is to respect landowners' efforts to exclude intruders." (*Id.*) For that reason, the Hunting Clubs insist that we should require consent, a warrant, or an exception to the warrant requirement to invade private land where government officials see clear signs of ownership.

As to *Russo*'s consistency with related precedent, the Hunting Clubs maintain that *Russo* constitutes a break from precedent and that, as a result, *stare decisis* has less force. Specifically, the Hunting Clubs explain that, "[b]efore *Russo*, this Court followed a baseline rule: [Article I,] Section 8 protects property owners' right to privacy when they have 'a common-law interest' or the 'right to exclude others from the premises.'" (*Id.* at 45 (quoting *Commonwealth v. Gordon*, 683 A.2d 253, 258 (Pa. 1996)).) The Hunting Clubs also note that, in *Commonwealth v. Ickes*, 873 A.2d 698 (Pa. 2005), this Court held that

"[g]ame [o]fficers must . . . adhere to the minimum [constitutional] standards applicable to all law enforcement officers" and, consequently, this Court struck down a statutory provision that allowed game officers to stop any person at any time and demand identification "without a standard of suspicion." (*Id.* at 46 (some alterations in original) (quoting *Ickes*, 873 A.2d at 703).) The Hunting Clubs complain that, just two years later, this Court reversed course in *Russo* and "held that the very existence of hunting laws exempts game wardens from scrutiny when searching private land." (*Id.*) The Hunting Clubs further observe that, in *Alexander*, this Court held that "our constitution prioritizes the protection of privacy rights caused by the unreasonable search above the need . . . to assist law enforcement efforts." (*Id.* (alteration in original) (quoting *Alexander*, 243 A.3d at 204).) "*Russo*'s tension with *Alexander*," the Hunting Clubs claim, "supplies yet another reason not to apply *stare decisis*." (*Id.* at 47.)

Finally, the Hunting Clubs argue that *Russo* has produced no valid reliance interests because it was decided only 18 years ago and, since that time, neither this Court nor any other Pennsylvania court has applied *Russo* and/or the open fields doctrine in a published decision. They acknowledge that the Commission's officers use *Russo* to enter private land but suggest that they have no valid reliance interest in doing so, noting that, "[i]f it is clear that a practice is unlawful, individuals' interest in its discontinuance clearly outweighs any law enforcement 'entitlement' to its persistence."[9] (*Id.* (quoting *Alexander*, 243 A.3d at 200).)

---

[9] The Pennsylvania Association of Criminal Defense Lawyers, the Defender Association of Philadelphia, and the ACLU of Pennsylvania (Defense Amici) jointly filed an *amicus* brief in support of the Hunting Clubs' position, wherein they add that "*stare decisis* should not be a barrier to holding that the open fields doctrine violates Article I, Section 8" because *stare decisis* "is not a vehicle for perpetuating error" and there is a special justification for overruling *Russo*, given that it relies upon *Oliver* and *Oliver*'s rationale has been eroded. (Defense Amici's Br. at 28 (citation omitted).)

The Commission and Warden Gritzer, on the other hand, argue that this Court must have a special justification for overruling one of its prior decisions, which they claim is absent here. They, however, only address *stare decisis*'s reliance factor. To that end, the Commission and Warden Gritzer observe that the predecessor to Sections 303(c) and 901(a)(2) of the Code was enacted in 1923 and, although *Russo* was not decided until 2007, the Commission has relied on the open fields doctrine for over a century to carry out its duties. They note that, less than one year later, in 1924, the Supreme Court issued its decision in *Hester*, wherein it recognized the open fields doctrine under the Fourth Amendment. The Commission and Warden Gritzer explain that, "[t]hroughout the century following *Hester*, courts in Pennsylvania have consistently applied the 'open fields' doctrine in cases governed by the Pennsylvania Constitution." (Commission and Warden Gritzer's Br. at 18.) Indeed, the Commission and Warden Gritzer point out that, three decades before *Russo* was decided, this Court, in *Treftz*, invoked the open fields doctrine to reject a suppression challenge to a corpse that was discovered in the defendant's open fields. Thus, the Commission and Warden Gritzer explain:

> [T]he Hunting Clubs seek to jettison a longstanding rule of constitutional law that "is as old as the common law" and has been applied by both the . . . Supreme Court and this Court[] and relied upon by the Commonwealth to protect its wildlife[] for almost a century.

(*Id.* at 19.) Consequently, the Commission and Warden Gritzer emphasize that reliance interests favor adhering to *Russo*.

In reply, the Hunting Clubs argue that "*Russo* was patently flawed" because "[i]t demonstrably misread [Article I,] Section 8's text in a way that exposed the vast majority of private land to warrantless searches." (Hunting Clubs' Reply Br. at 10.) The Hunting Clubs suggest that this is exactly "the kind of 'special justification' that justifies revisiting *Russo*." (*Id.* (internal citation omitted).) The Hunting Clubs reiterate that "[t]he *Russo* briefing was thin" and further note that, "[i]n our adversarial system, courts depend on the

parties to make their best points." (*Id.* at 10-11.) The Hunting Clubs suggest that, by failing to make his best points, "Russo undermined the 'quality of [the Court's] reasoning.'" (*Id.* at 11 (alteration in original) (quoting *Alexander*, 243 A.3d at 196).) Lastly, the Hunting Clubs contend that the Commission and Warden Gritzer's reliance argument must fail because the Commission "has no valid 'interest' in following a doctrine that violates [Article I,] Section 8." (*Id.*)

*ii. Analysis*

This case invites us to interpret, again, Article I, Section 8 and its tolerance for the federal open fields doctrine. *Stare decisis*, therefore, is at its weakest. Nevertheless, we still must look to the *stare decisis* factors to assess whether there is a special justification to overrule *Russo*. In so doing, we need not engage in a frontal attack of *Russo*'s reasoning or analysis. Instead, we begin by pointing out that our more recent decision in *Alexander* adopted then-Justice, now-Chief Justice Todd's "compelling analysis" of "the heightened protocols of Article I, Section 8" from her dissent in *Commonwealth v. Gary*, 91 A.3d 102 (Pa. 2014), including her explanation that, "[u]nlike the Fourth Amendment, Article I, Section 8 uses the [broader] term 'possessions'" and that this "difference in language suggests that the warrant requirement of Article I, Section 8 was intended to protect an individual's privacy interest in all of his or her possessions." *Alexander*, 243 A.3d at 202 (quoting *Gary*, 91 A.3d at 143 (Todd, J., dissenting).[10] Given the *Alexander* Court's recognition that Article I, Section 8 uses more expansive terminology than its federal counterpart, this alone constitutes a sufficient

---

[10] More specifically, in *Alexander*, this Court adopted Justice Todd's *Edmunds* analysis from her dissent in *Gary*, which included a detailed discussion of Article I, Section 8's history. *See Alexander*, 243 A.3d at 202 ("We conclude that Justice Todd's *Edmunds* analysis thoroughly and convincingly established the heightened protocols of Article I, Section 8 and see no need to tread that same ground. The scholarly analysis thoroughly discussed the four *Edmunds* factors, and we adopt Justice Todd's compelling analysis as our own.").

reason to revisit *Russo*.  We, nonetheless, briefly consider the remaining *stare decisis* factors, as we believe that they provide additional justification for revisiting *Russo*.[11]

Turning to the workability of the rule established by *Russo*—*i.e.*, application of the open fields doctrine in Pennsylvania—we agree with the Hunting Clubs that the utility of the doctrine to the Commission's officers and other government officials in the performance of their duties under the Code, the ERA, and other laws, must give way to the privacy protection afforded by Article I, Section 8.  As this Court explained in *Alexander*: "We are not a policy branch, and we cannot ignore constitutional commands even if they make the work of police . . . harder."  *Alexander*, 243 A.3d at 198.

With respect to *Russo*'s age and reliance thereon, we note that *Russo* is only a little over 18 years old and no Pennsylvania court has applied *Russo*'s holding in a published decision.  While Pennsylvania courts, including this Court, have referenced *Russo* and its holding, those courts cite *Russo* for general principles of law and/or to point out that this Court has extended greater protections under the Pennsylvania Constitution than that afforded by the United States Constitution when our independent analysis concludes that a different standard should be applied.  *See, e.g., Gary*, 91 A.3d at 108; *Commonwealth v. Arter*, 151 A.3d 149, 156 (Pa. 2016).  In other words, to our knowledge, no Pennsylvania court has relied upon *Russo* in a published decision to conclude that the warrantless entry onto posted, private land located beyond the curtilage of a home or building did not violate Article I, Section 8.  Consequently, there is no long post-*Russo* lineage and/or multiple precedents to overcome, and, therefore, we would not "disrupt[] an entire area of law" if we overrule it.  *Allegheny Reprod. Health Ctr.*, 309 A.3d at 887.

---

[11] We need not address *Russo*'s consistency with related decisions because, as explained above, *Russo* has become an outlier with respect to how this Court approaches Article I, Section 8 and the privacy protection it affords.  To the extent that this Court's precedent remains relevant, however, we refer to the portion of our *Edmunds* analysis below addressing interpretive case law from this Court relative to Article I, Section 8.

The Commission and Warden Gritzer, nevertheless, claim that, even prior to *Russo*, they have relied on the open fields doctrine to support their warrantless entries onto private land. To the extent that the Commission's officers entered land in reliance on *Hester*, such warrantless pre-*Russo* entries were based upon the open fields doctrine under the Fourth Amendment, not any conclusion about the reach of the doctrine under Article I, Section 8. To state the obvious, any pre-*Russo* conduct cannot have been in reliance on *Russo* and, therefore, factors not into our consideration of whether *Russo* should remain extant.

Upon consideration of these *stare decisis* factors, as well as the fact that *stare decisis* is, here, at its weakest, we conclude that our respect for *stare decisis* is not a bar to reconsidering *Russo* at this time. Given that conclusion, we now consider whether *Russo* was wrongly decided—*i.e.*, whether Article I, Section 8 affords greater protection than the Fourth Amendment in the context of open fields.

### B. Whether *Russo* Was Wrongly Decided – *Edmunds* Analysis

In order to determine whether *Russo* was wrongly decided, we again look to the analysis set forth in *Edmunds* in order to determine whether Article I, Section 8 should provide greater protection than the Fourth Amendment in the context of open fields—*i.e.*, whether the open fields doctrine, as applied in Fourth Amendment jurisprudence, is in harmony with Article I, Section 8. *Edmunds* instructs that, when considering whether the Pennsylvania Constitution affords greater protection than the United States Constitution, we should independently analyze four factors: (1) "the text of the Pennsylvania constitutional provision;" (2) the history of that constitutional provision, including relevant Pennsylvania case law; (3) related case law from other jurisdictions; and (4) "policy considerations, including unique issues of state and local concern[] and applicability within modern Pennsylvania jurisprudence." *Edmunds*, 586 A.2d at 895.

*i. Parties' Arguments*

The Hunting Clubs argue that *Russo* was wrongly decided because all four *Edmunds* factors weigh in favor of rejecting the open fields doctrine in Pennsylvania.[12] As to the text of Article I, Section 8, the Hunting Clubs reference a number of historical sources, including dictionaries, statutes, legal decisions, and writings from "major founding-era thinkers" indicating that the term "possessions" includes land. (Hunting Clubs' Br. at 15-18.) The Hunting Clubs also reference a new "corpus linguistics" study, which they allege "confirms that[,] when founding-era Americans used the term 'possessions,' they typically meant land." (*Id.* at 18 (citing James C. Phillips, *A Corpus Linguistics Analysis of "Possessions" in American English, 1760-1776*, 27:1 Chapman L. Rev. 143 (2023)).) Lastly, they suggest that "[n]earby constitutional text provides further evidence that the term 'possessions' includes land." (*Id.* at 19 (citing, *inter alia*, Pa. Const. art. I, § 1).)

With respect to its history, the Hunting Clubs note that Article I, Section 8 was adopted to prevent arbitrary searches by government officials that had been occurring during pre-Revolutionary times. They explain that "[e]arly Pennsylvanians' disdain for arbitrary searches aligned with the [English] common law's protections for private land." (*Id.* at 23.) In support, the Hunting Clubs suggest that both historical and modern publications and cases demonstrate that Pennsylvania landowners have always maintained—from the onset of settlement—a right to exclude intruders from their land and

---

[12] The Hunting Clubs emphasize that they do not concede that the federal open fields doctrine is correct. In doing so, they point out that, after *Katz v. United States*, 389 U.S. 347 (1967), "reoriented Fourth Amendment law around 'reasonable expectations of privacy,' a majority of federal circuits and state supreme courts rejected the open fields doctrine." (Hunting Clubs' Br. at 14 n.1.) The Hunting Clubs note, however, and we agree, that "*Edmunds* does not require [us] to question the federal doctrine to reject it under [Article I,] Section 8." (*Id.*) We, therefore, do not discuss and/or question the federal open fields doctrine further.

that an invasion of private land, during those pre-Revolutionary times, constituted a trespass. The Hunting Clubs further explain that this Court has repeatedly held—"at least 17 times"—that Article I, Section 8 affords an enhanced privacy right beyond that which is proscribed by the Fourth Amendment. (*Id*. at 26 & n.3.) The Hunting Clubs maintain that this enhanced privacy right encompasses the right to exclude intruders from private property. In support, they observe that Article I, Section 8 protects the right of Pennsylvanians to be "secure" in their possessions and that the term "secure" is "tied to property rights." (*Id.* at 26-27 (quoting, *inter alia*, John Locke, *Second Treatise of Civil Government* §§ 95, 123 (1690) (noting that people form governments to "secure enjoyment of their properties")).) The Hunting Clubs also explain that, in *Gordon*, a case examining whether a squatter had a right to privacy under Article I, Section 8, this Court ultimately concluded that a party could establish a right to privacy by showing "characteristics of ownership," such as the "critical . . . right to exclude others from the premises in question." (*Id.* at 27 (quoting *Gordon*, 683 A.2d at 258).) Although that squatter did not make the necessary showing and this Court, therefore, denied him relief, the Hunting Clubs insist that *Gordon* is relevant here: "Just as early Pennsylvanians were entitled to privacy when they closed their land, today's landowners deserve privacy when they take lawful steps to exclude intruders." (*Id.* at 28.)

As to precedent from other jurisdictions, the Hunting Clubs argue that "seven states have rejected the open fields doctrine under [constitutional] provisions similar to [Article I,] Section 8—either because their provisions protect 'possessions' or because they protect more privacy than the Fourth Amendment." (*Id.* at 29.) More specifically, the Hunting Clubs explain that the constitutions of three states—Mississippi, Tennessee, and Vermont—protect "possessions" in the search provisions of their respective constitutions and that their high courts have rejected the open fields doctrine on the basis that the term

"possessions" is broader than the term "effects" as used in the Fourth Amendment and encompasses land. The Hunting Clubs also note that courts in both Vermont and Tennessee have rejected warrantless searches of land by game wardens. The Hunting Clubs further emphasize that the high courts from four other states—Washington, Oregon, New York, and Montana—all of which have adopted heightened privacy protections under their respective state constitutions, have similarly rejected the open fields doctrine. The Hunting Clubs, therefore, insist that Article I, Section 8, "which this Court has repeatedly held protects more privacy than the Fourth Amendment, surely has no less regard for privacy than the Montana, New York, Oregon, and Washington constitutions." (*Id.* at 34.)

Finally, with respect to public policy, the Hunting Clubs argue that rejection of "the open fields doctrine harmonizes the state policies that converge on private land"—*i.e.*, trespass, adverse possession, ejectment, and quiet title—all of which, according to the Hunting Clubs, treat land as a "possession." (*Id.* at 34-35.) The Hunting Clubs further maintain that "allowing state officials to enter private land whenever and however they please would seriously undermine at least three state constitutional rights: [a] landowner['s] [right to] privacy, associational freedom [under Article I, Section 7 of the Pennsylvania Constitution[13]], and [the] right to bear arms" under Article I, Section 21 of the Pennsylvania Constitution.[14] (*Id.* at 35.) The Hunting Clubs, nevertheless, acknowledge that the ERA "allows game wardens to enforce reasonable hunting laws." (*Id.* at 37.) They maintain, however, that "game wardens' power to enforce hunting laws

---

[13] The Hunting Clubs reference Article I, Section 7 as the basis for associational freedom, but freedom of association is actually found in Article I, Section 20 of the Pennsylvania Constitution, which provides, in relevant part, that "[t]he citizens have a right in a peaceable manner to assemble together for their common good . . . ." Pa. Const. art. I, § 20.

[14] Article I, Section 21 provides: "The right of the citizens to bear arms in defense of themselves and the State shall not be questioned." Pa. Const. art. I, § 21.

must honor—not displace—other state constitutional rights." (*Id.*) In the Hunting Clubs' view, "[t]he solution . . . is simple:"

> Rather than give officials unlimited power to invade private land at the expense of other rights, this Court should follow the path charted in Montana, Tennessee, and Vermont. Like Pennsylvania, Montana has a provision securing environmental rights, and the other two states have clauses authorizing hunting regulations. Yet none of [those] states follow the open fields doctrine. Instead, game wardens must get consent, a warrant, or prove an exception to the warrant requirement before searching posted land. That approach harmonizes the important state policies that converge on private land.[15]

(*Id.* at 37-38 (citations omitted).)

The Commission and Warden Gritzer similarly engage in a detailed *Edmunds* analysis, but they reach a different result. In their view, consideration of the *Edmunds* factors "inevitably compel[s] the conclusion that, in the 'open fields' context, the requirements of the Fourth Amendment and the requirements of [Article I,] Section 8 are coextensive." (Commission and Warden Gritzer's Br. at 20.) As to the text of Article I, Section 8, the Commission and Warden Gritzer argue that the "slight difference in wording" between the Fourth Amendment and Article I, Section 8—*i.e.*, "effects" versus "possessions"—"does not warrant the dramatic departure from Fourth Amendment

---

[15] Defense Amici, who, as stated previously, filed an *amicus* brief in support of the Hunting Clubs' position in this matter, generally argue that *Russo* should be overruled because Article I, Section 8 does not allow officials unfettered discretion to trespass and search private land.

The Pennsylvania Farm Bureau and the National Federation of Independent Business Small Business Legal Center Inc. also jointly filed an *amicus* brief in support of the Hunting Clubs' position, wherein they focus on policy considerations unique to Pennsylvania— namely, the enactment of certain agriculturally related legislation and technological advancements for securing a warrant—which they suggest support discarding the open fields doctrine in Pennsylvania.

The Commonwealth Foundation for Public Policy Alternatives (Commonwealth Foundation) also filed an *amicus* brief in support of the Hunting Clubs' position, wherein it argues that "the open fields doctrine offends the guaranteed right of privacy embedded in Article I, Section 8." (Commonwealth Foundation's Br. at 7 (capitalization omitted).)

jurisprudence proposed by the Hunting Clubs." (*Id.* at 22.) The Commission and Warden Gritzer further contend that this Court, in *Russo*, properly applied the interpretive doctrine of *ejusdem generis* to conclude that open fields did not constitute "possessions." In support, they direct our attention to *Brent*, a case in which the Kentucky Court of Appeals[16] applied *ejusdem generis* to the search provision of Kentucky's constitution and concluded that such provision "was intended to mean the intimate things about one's person." (*Id.* at 24 (quoting *Brent*, 240 S.W. at 48).) The Commission and Warden Gritzer suggest that, "[g]iven that this Court's textual analysis in *Russo* precisely tracked the [Kentucky] Court of Appeals' textual analysis in *Brent*, which had interpreted and applied virtually identical language 85 years earlier" and predated the Supreme Court's introduction of the open fields doctrine in *Hester*, "there is simply no merit to the Hunting Clubs' contention that *Russo's* construction of the word 'possessions' appearing in [Article I,] Section 8 resulted from deficient briefing or faulty research." (*Id.* at 25-26.)

With respect to Article I, Section 8's history, the Commission and Warden Gritzer begin by distinguishing *Gordon*, noting that this Court merely held that the squatter had no reasonable expectation of privacy in the abandoned house that he occupied because he had no legal right to enter the house and/or to exclude others therefrom. They insist, however, that *Gordon* does not stand for the proposition that "the Hunting Clubs enjoy constitutional protection from warrantless searches of open fields merely because they have the right to exclude non-members from those fields." (*Id.* at 30.) Indeed, the Commission and Warden Gritzer note that, even prior to *Russo*, this Court reasoned that the curtilage is "afforded *a greater privacy protection than an open field* because of the traditional significance of the home as a haven from governmental intrusions." (*Id.* at 31 (emphasis in original) (quoting *Commonwealth v. Oglialoro*, 579 A.2d 1288, 1292

---

[16] At the time that *Brent* was decided, the Court of Appeals was Kentucky's highest court.

(Pa. 1990)).) To accept the Hunting Clubs' argument, they explain, this Court would have to treat an individual's home and curtilage the same as an individual's open fields. To that end, the Commission and Warden Gritzer point out that, while the Hunting Clubs' members may have private conversations while hunting or fishing on the Hunting Clubs' land, it is not objectively reasonable to expect those conversations to be private. Hunting, fishing, and trapping, they emphasize, are simply not activities that can take place in the home or its curtilage such that an expectation of privacy should attach. Thus, the Commission and Warden Gritzer contend that, because there is no objectively reasonable expectation of privacy in the large portion of the Hunting Clubs' land located beyond the curtilage, such land cannot constitute "possessions" under Article I, Section 8.

As to precedent from other states, the Commission and Warden Gritzer reiterate that this Court's construction of Article I, Section 8 "in *Russo* mirrored the construction of [the respective provision of] the Kentucky Constitution in *Brent*" and further note that, in the century since *Brent* was decided, *Brent* "has continued to govern cases involving the reach and application" of the Kentucky Constitution. (*Id.* at 33, 34.) They also point out that "[s]ome state courts have construed the word 'possessions' to mean essentially the same thing as the word 'effects.'" (*Id.* at 34.) The Commission and Warden Gritzer then generally explain that *Russo*'s adoption of the open fields doctrine was consistent with decisions rendered by courts in "New Hampshire, Nebraska, Indiana, Texas, Missouri, Oklahoma, Kentucky, New Jersey, and California" and that, "[i]n *Russo*, this Court adequately explained why contrary decisions rendered by courts in New York, Washington, Vermont, and Montana did not provide persuasive reasons for interpreting [Article I,] Section 8 to prohibit warrantless searches of open fields in Pennsylvania." (*Id.* at 35 (citing *Russo*, 934 A.2d at 1210-12).) The Commission and Warden Gritzer continue that, "[t]o the extent that this Court deems it appropriate to consider decisions

from other [s]tates that were not available when *Russo* was decided," the North Dakota Supreme Court, in *State v. Mittleider*, 809 N.W.2d 303 (N.D. 2011), rejected the exact same argument that the Hunting Clubs advance here and concluded that the North Dakota Constitution did not protect open fields. (*Id.* at 36.) In the Commission and Warden Gritzer's view, "*Mittleider* provides further support for this Court's decision in *Russo*." (*Id.*)

Finally, with respect to public policy, the Commission and Warden Gritzer emphasize that, as this Court correctly explained in *Russo*, rejection of the open fields doctrine "in the hunting context would place [Article I,] Section 8 on a collision course with the [ERA]." (*Id*. at 36-37.) In their view, the Entry Statutes are all designed to fulfill the Commission's constitutional duty under the ERA to protect wildlife. They note that the General Assembly has vested "ownership" of "game or wildlife" in the Commission and that "game or wildlife" is "outside the scope of purely private property." (*Id.* at 38 (quoting Section 103(a) of the Code, 34 Pa. C.S. § 103(a); *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 955 (Pa. 2013)).) Thus, because the Commission has an ownership interest in the wild animals living on or traveling through the Hunting Clubs' land, the Commission and Warden Gritzer assert that "any subjective expectation of privacy against governmental intrusion on open fields is not an expectation that our society has ever been willing to recognize as reasonable." (*Id.* (quoting *Russo*, 934 A.2d at 1213).) The Commission and Warden Gritzer further point out that a rejection of the open fields doctrine would "'displace' much of this Court's ERA jurisprudence on a much broader scale, including decisions that predated *Russo* and [that] did not specifically involve open fields." (*Id*. at 39.) In support, they note that this Court has utilized the ERA as a basis for upholding provisions of the Solid Waste Management Act[17] to allow the warrantless

---

[17] Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§ 6018.101 to .1003.

search of certain physical structures without violating Article I, Section 8. (*Id.* at 39 (citing *Dep't of Env't Res. v. Blosenski Disposal Serv.*, 566 A.2d 845, 849-50 (Pa. 1989)).) The Commission and Warden Gritzer, therefore, claim that, because "the ERA can sometimes justify warrantless searches of physical structures without violating [Article I,] Section 8, it follows . . . that it can justify warrantless searches of open fields, which have *never* enjoyed protection under [Article I,] Section 8." (*Id.* at 40 (emphasis in original) (citing *Russo*, 934 A.2d at 1212-13).) As a result, the Commission and Warden Gritzer insist that the Hunting Clubs have ultimately failed to articulate any reason to reject *Russo's* reliance on the ERA as a policy reason for adopting the open fields doctrine.[18]

In reply, the Hunting Clubs argue that the Commission and Warden Gritzer essentially repeat *Russo's* textual errors. They expound that "*Russo*—hamstrung by deficient briefing—never asked how the founding generation would have understood the term 'possessions.'" (Hunting Clubs' Reply Br. at 4.) According to the Hunting Clubs, the text of Article I, Section 8 is "clear:" "possessions" includes private land. (*Id.* at 5.) The Hunting Clubs point out that, "[w]hen it comes to original meaning," the Commission and Warden Gritzer "cite[] zero founding-era dictionaries, statutes, cases, or writings" and have "no response to Professor Phillips's finding that '86% of the time[] possessions likely or clearly included land.'" (*Id.* at 6 (quoting Phillips, *supra*, at 163).) The Hunting Clubs also argue that, because the text of Article I, Section 8 is clear and there is no ambiguity to resolve, the statutory canon *ejusdem generis* does not, as the Commission and

---

[18] The Pennsylvania Fish and Boat Commission (PFBC) filed an *amicus* brief in support of the Commission and Warden Gritzer's position in this matter. In that brief, PFBC generally argues that *Russo* is correct and the Hunting Clubs have failed to provide any compelling reason to overturn that decision.

The Pennsylvania State Police also filed an *amicus* brief in support of the Commission and Warden Gritzer's position, wherein it generally argues that, in *Russo*, this Court properly concluded that the plain text of Article I, Section 8 does not encompass real property.

Warden Gritzer suggest, apply. The Hunting Clubs explain, however, that, even if *ejusdem generis* did apply, "reading 'possessions' to include land would not render any of [Article I, Section 8's] preceding terms meaningless" because none of those terms include land; instead, it would honor the *ejusdem generis* canon because those preceding terms are all types of property. (*Id.* at 8.) As to the Commission and Warden Gritzer's reliance on *Brent*, the Hunting Clubs suggest that, in that case, the Kentucky Court of Appeals made the same errors relative to the *ejusdem generis* canon as this Court did in *Russo* and "[t]he mere fact that *Brent* made *Russo's* errors first does not justify repeating them." (*Id.* at 9.)

The Hunting Clubs further maintain, contrary to the Commission and Warden Gritzer's contentions, that they have a legitimate expectation of privacy in their "closed land." (*Id.* at 11.) In support, the Hunting Clubs point out that the historical context in which Article I, Section 8 was adopted supports a landowner's right to privacy in closed land. They suggest that this historical right to privacy is also reflected in the text of Article I, Section 8 itself and "[t]his Court has always held[—other than in *Russo*—]that the owner of property enumerated in [Article I,] Section 8 can legitimately expect privacy from physical intrusions *unless* he fails to preserve it." (*Id.* at 13 (emphasis in original).) The Hunting Clubs further posit that, if *Treftz* is the Commission and Warden Gritzer's best case, "*Russo* is truly an outlier" because, in *Treftz*, the officers entered a field "beyond the fenced area" that was "freely open" to the public and this Court's lead holding was based on a lack of standing, as the defendant did not own the land in question. (*Id.* at 13, 14 (quoting *Treftz*, 351 A.2d at 267).) The Hunting Clubs maintain that, the text of Article I, Section 8 aside, the Commission and Warden Gritzer have failed "to explain why it's 'legitimate' to expect privacy for . . . activities at home but 'illegitimate' to expect them on private land." (*Id.* at 15.) In the Hunting Clubs' view, it is entirely reasonable to

expect privacy on their private land when they have taken steps to exclude intruders therefrom.

The Hunting Clubs also contend that the Commission and Warden Gritzer's public policy argument relative to the ERA "treats [Article I,] Section 8 as irrelevant when [the ERA] is involved." (*Id.* at 16.) To that end, the Hunting Clubs suggest that "[t]he Constitution does not require this Court to make a Sophie's Choice about which parts to enforce and which to ignore;" instead, Article I, Section 8 should be read in harmony with the ERA. (*Id.*) The Hunting Clubs explain that the ERA was adopted to put environmental rights "on par with" political rights. (*Id.* at 17 (quoting *Robinson Twp.*, 83 A.3d at 953).) They maintain that, despite the fact that the ERA appoints the Commonwealth as "trustee" over the Commonwealth's "public natural resources" and that a trustee "cannot properly exercise [his] power . . . in such [a] manner as will involve a violation of any of his duties to the beneficiary," the Commission and Warden Gritzer propose to enforce the ERA in a way that violates Article I, Section 8. (*Id.* (some alterations in original) (citations omitted).) The Hunting Clubs propose that, "[n]ot only is that wrong," but it is also unnecessary, given that "Vermont, Montana, and Tennessee all have constitutional provisions that either secure environmental rights or authorize reasonable hunting regulations" and none of those states have adopted the open fields doctrine but, rather, require their game wardens to obtain a warrant or prove an exception to the warrant requirement before searching private land. (*Id.* at 18.) The Hunting Clubs also point out that the Commission and Warden Gritzer's theory that game wardens can ignore Article I, Section 8 when they are enforcing hunting laws and regulations under the ERA "would have grave implications for other rights." (*Id.* at 19.) In support, the Hunting Clubs posit, following the Commission and Warden Gritzer's logic, that "the [General Assembly] could forbid hunters from posting on social media in order to discourage . . . hunting," which "would surely violate

[Article I,] Section 7's speech protections" and "this Court would have to uphold the law because it was designed to conserve natural resources under [the ERA]." (*Id.*)

*ii. Analysis*

a. Text of Article I, Section 8

We begin our *Edmunds* analysis with an examination/comparison of the language of Article I, Section 8 and the Fourth Amendment. As noted above, the Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, *and effects*, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

(Emphasis added.) Article I, Section 8 similarly, yet *distinctly*, provides:

> The people shall be secure in their persons, houses, papers *and possessions* from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

(Emphasis added.) While the language of Article I, Section 8 may be similar to that of the Fourth Amendment, "we are not bound to interpret the two provisions as if they were mirror images." *Edmunds*, 586 A.2d at 895-96. While slight, there is, indeed, a textual distinction between the Fourth Amendment and Article I, Section 8. Unlike the Fourth Amendment, which establishes a "right of the people to be secure in their persons, houses, papers, and *effects*," Article I, Section 8 guarantees the right of the people to "be secure in their persons, houses, papers and *possessions*." U.S. Const. amend. IV (emphasis added); Pa. Const. art. I, § 8 (emphasis added). In *Oliver*, the Supreme Court concluded that "the term 'effects' is less inclusive than 'property' and cannot be said to encompass open fields." *Oliver*, 466 U.S. at 177. The same, however, cannot be said for the term "possessions" as used in Article I, Section 8.

This Court, in *Russo*, applied the interpretative doctrine of *ejusdem generis* to Article I, Section 8 and concluded that "the term 'possessions' should be construed in light of the particular words preceding it, all of which refer to intimate things about one's person." *Russo*, 934 A.2d at 1206. The *Russo* Court continued that, "[i]f 'possessions' had been intended to refer to everything one owned, such as open fields, then there would have been no need to specify the other three objects." *Id.* Consequently, the *Russo* Court found the Supreme Court's interpretation of the text of the Fourth Amendment in *Oliver* to be persuasive and, as such, determined that "[n]othing in the plain text of Article I, Section 8 suggests that open fields are entitled to the same degree of privacy as one's person, house, papers, and possessions." *Id.* By applying the *ejusdem generis* doctrine to reach this conclusion, however, the *Russo* Court failed to explore first the actual meaning of the word "possessions" and, thus, the intent behind the use of that particular word in the constitutional text. *See Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020) ("[W]hile *ejusdem generis* is a useful tool of statutory construction, such tools are used for the sole purpose of determining the intent of the General Assembly. *Ejusdem generis* must yield in any instance in which its effect would be to confine the operation of a statute within narrower limits that [sic] those intended by the General Assembly when it was enacted.").

"When interpreting constitutional language, we are mindful that the language of the Constitution controls and that it must be interpreted 'in its popular sense, as understood by the people when they voted on its adoption.'" *McLinko v. Dep't of State*, 279 A.3d 539, 577 (Pa. 2022) (citation omitted). There is evidence that both the framers of the Pennsylvania Constitution and the people who voted to ratify it understood the term "possessions" as used in Article I, Section 8 to include land. First, "[i]n ascertaining the meaning of a word in accordance with its common and approved usage, this Court has

found it helpful to consult dictionaries." *Id*. Around the time of Article I, Section 8's enactment,[19] various English language and legal dictionaries defined "possession" and "possess" in a manner that signifies that the term "possessions" as used in Article I, Section 8 included land. *See, e.g.*, Giles Jacob, *A New Law Dictionary* (1739) (providing that "possession . . . is either actual, where a person actually enters into lands or tenements descended or conveyed to him; or in law, when lands, &c. are descended to a man and he hath not actually entered into them" (capitalization omitted)); Nathan Bailey, *The New Universal Etymological English Dictionary* (4th ed. 1756) (defining "[a]ctual possession" as "when a man[] actually enters into lands or tenements descended to him"); 2 Timothy Cunningham, *A New and Complete Law Dictionary* (1764) (defining "[a]ctual possession" as "when a man actually enters into lands and tenements to him descended" and "[p]ossession in law" as "when the lands or tenements are descended to a man, and he hath not as yet actually entered into them"); 2 Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773) (defining "possession" as "[t]he state of owning or having in one's own hands or power; property" and "[t]he thing possessed"); 2 John Ash, *The New and Complete Dictionary of the English Language* (1775) (defining "possess" as "[t]o

---

[19] As explained more fully *infra*, the right of the people to be free from unreasonable searches and seizures was initially set forth in Clause 10 of Pennsylvania's original Constitution of 1776, which provided:

> That the people have a right to hold themselves, their houses, papers, and possessions free from search and seizure, and therefore warrants without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his or their property, not particularly described, are contrary to that right, and ought not be granted.

*Arter*, 151 A.3d at 157 & n.3. Clause 10, however, "was reworded during the 1790 revisions to the Pennsylvania Constitution[] and reappeared as Article I, Section 8." *Id.* at 157. Notably, and rather importantly, both Clause 10 and Article I, Section 8 contain the term "possessions."

have as an owner, to occupy"); William Perry, *The Royal Standard English Dictionary* (1775) (defining "possession" as "property; a having in one's power"); Thomas Dyche & William Pardon, *A New General English Dictionary* (1781) (defining "possession" as "having any thing in our own keeping or power; in *Law*, he that is the present occupier, though it be by disseisin, hath right to any land, house, &c. against all others"); 2 Thomas Sheridan, *A Complete Dictionary of the English Language* (3d ed. 1790) (defining "possession" as "[t]he state of owning or having in one's own hands or power" and "possess" as "[t]o have as an owner, to be master of; to enjoy, or occupy actually"); James Barclay, *Complete and Universal English Dictionary* (1792) (defining "possess" as "to have as an owner; to enjoy or occupy actually" and "possession" as "the state of having in one's hands or power" and "[t]he thing enjoyed by a person"); and 2 Richard Burn & John Burn, *A New Law Dictionary* (1792) (describing "possession" as, *inter alia*, "the lowest degree of title, which may be without any apparent right, or pretence of right; as where one man invades the possession of another, and, by force or surprise, turns him out of the occupation of his lands, which is usually called a disseisin").

Second, founding-era statutes similarly signify that the Provincial Assembly and later the General Assembly—*i.e.*, Pennsylvania lawmakers—referred to land as "possessions." *See, e.g.*, Act of November 27, 1700 (2 St.L. 12, Ch. 11, § 1) (establishing that "whosoever shall violently or forcibly enter in to the house or possessions of any other person within this province or territories . . . shall be punished as a breaker of the peace"); Act of March 26, 1762 (6 St.L. 196, Ch. 480, § 6) (granting city officials "full power and authority to enter upon the lots, grounds and possessions of any person or persons . . . through which the said common sewers do or ought to run to regulate them, and . . . to make, amend and repair the same"); Act of March 26, 1785 (11 St.L. 519, Ch. 1145, § 4) (providing that "no person or persons that now hath or have any claim to the possession

of any lands, tenements or hereditaments . . . from the commonwealth . . . shall hereafter enter or bring any action for the recovery thereof . . . unless he . . . [has] had the quiet and peaceable possession of the same within seven years next before such entry or bringing such action"); Act of April 4, 1785 (11 St.L. 560, Ch. 1159, Preamble) (setting forth "the happy termination of the late war the people of this state are in quiet possession of very extensive and valuable tracts of land, which require cultivation and improvement" as reason to erect and open loan office).  Indeed, Pennsylvania lawmakers appear to have even made a distinction between "effects" and "possessions."  *See, e.g.*, Act of February 18, 1769 (7 St.L. 277, Ch. 594, §§ 4, 6) (providing that city officials "shall meet . . . and . . . consider, determine and agree on which of the said streets and public lanes and alleys within the inhabited and settled parts of the said city shall be first paved, having regard to the streets that are most used by the country in bringing their produce and effects to market" and granting city officials "full power and authority to enter upon the lots, grounds and possessions of any person or persons . . . through which the said common sewers do or ought to run, to regulate them, and . . . to make, amend and repair the same").

Third, early decisions from this Court referred to land as a "possession" or described the "possession" of land, thereby signifying that the original meaning of the term "possessions," as used in Article I, Section 8, included land.  *See, e.g.*, *Fothergill's Lessee v. Stover*, 1 Dall. 6, 7 (Pa. 1763) (concluding that party had proven that "[s]ettlement and [p]ossession" of land had been made); *Richardson's Lessee v. Campbell*, 1 Dall. 10, 10 (Pa. 1764) (noting, in land dispute, that plaintiff had proven "upwards of twenty [y]ears [p]ossession"); *Andrew's Lessee v. Fleming*, 2 Dall. 93, 94 (Pa. 1786) (describing ejectments as "possessory actions"); *McCurdy v. Potts*, 2 Dall. 98, 98-99 (Pa. 1788) (finding in favor of plaintiff in trespass action, given that he "actually

entered, and enjoyed, for a length of time, a peaceable possession" and, therefore, "had not only an actual, but a legal possession"); *Fitzalden v. Lee*, 2 Dall. 205, 205-06 (Pa. 1793) (explaining that parties "agreed to try the right to the possession in a summary manner" and that defendant was in possession of land by agreement); *Peaceable v. Nicholls*, 1 Yeates 293, 294 (Pa. 1793) (explaining how certain founding-era statute provided "excellent safeguard to landed possessions" relative to ejectment action); *Respublica v. Sloane*, 2 Yeates 229, 230 (Pa. 1797) (synopsis) (stating that purpose of certain founding-era statutes addressing forcible entry and detainer onto land "was to punish lawless persons for forcibly dispossessing their peaceable neighbours from their quiet possessions").

Finally, when "attempt[ing] to divine the framers' intent," "[w]e must consider our charter as a whole in terms of establishing a set of normative values that limit[] the government's authority to search without a warrant;" Article I, Section 8 must, therefore, be read "in conjunction with more abstract considerations of how far the government may encroach on the rights of citizens." *Alexander*, 243 A.3d at 206-07. Article I, Section 1 of the Pennsylvania Constitution[20] sets forth the inherent rights of the people to, *inter alia*, "acquir[e], possess[] and protect[] property." Pa. Const. art. I, § 1. It is axiomatic that, by granting the people the right to possess property in Article I, Section 1, the framers intended for all forms of property, including land, to constitute a "possession" for purposes of Article I, Section 8. *See In re Charlestown Outdoor, LLC*, 280 A.3d 948, 957 (Pa. 2022) (discussing property rights in zoning context and stating that "Article I, Section 1 . . . protects the people's right to enjoyment of private property").

---

[20] Article I, Section 1 provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, § 1.

For all of these reasons, we conclude that the original meaning of the term "possessions" as used in Article I, Section 8, unlike the term "effects" as used in the Fourth Amendment, includes land. We further conclude that this textual difference supports an interpretation of Article I, Section 8 that affords greater privacy protection to Pennsylvanians for open fields than does the Fourth Amendment.

b. <u>History of Article I, Section 8 and Interpretative Case Law</u>

This Court has previously set forth the history of Article I, Section 8 when considering, *inter alia*, whether, under a particular set of circumstances, Article I, Section 8 provides greater protection than the Fourth Amendment. *See Commonwealth v. Sell*, 470 A.2d 457, 466-69 (Pa. 1983); *Edmunds*, 586 A.2d at 896-99; *Gary*, 91 A.3d at 143-48 (Todd, J., dissenting); *Arter*, 151 A.3d at 157-61. We reiterate that history here.

"[C]ontrary to the popular misconception that state constitutions are somehow patterned after the United States Constitution, the reverse is true. The federal Bill of Rights borrowed heavily from the Declarations of Rights contained in the constitutions of Pennsylvania and other colonies." *Edmunds*, 586 A.2d at 896. Indeed, the right of Pennsylvanians to be free from unreasonable searches and seizures originated 15 years prior to the promulgation of the Fourth Amendment in Clause 10 of Pennsylvania's original Constitution of 1776. *See id.*; *Sell*, 470 A.2d at 466. In 1790, Clause 10 was reworded during the extensive revisions to Pennsylvania's original Constitution and reappeared as Article I, Section 8. *See Edmunds*, 586 A.2d at 897. "[W]ith the exception of the words 'subscribed to by the affiant,' which were added by the Constitutional Convention of 1873," Article I, Section 8 "has remained untouched for [200] years." *Id.* Despite these revisions, "the language employed in [Article I, Section 8] does not vary in any significant respect from the words of its counterpart in our first [C]onstitution"—*i.e.*, Clause 10. *Sell*, 470 A.2d at 467. "The text of Article I, [S]ection 8 thus provides no basis for the conclusion that the philosophy and purpose it embodies today differs from those

which first prompted the Commonwealth to guarantee protection from unreasonable governmental intrusion." *Id.* "Rather, the survival of the language now employed in Article I, [S]ection 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as a part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth." *Id.*

We, therefore, begin with a discussion of why and how Clause 10, and, in turn, Article I, Section 8, came to be in Pennsylvania. "[F]rom the time of its birth during our nation's revolutionary summer of 1776, [Clause 10] recognized and protected a natural and fundamental human right to privacy of our people." *Gary*, 91 A.3d at 143 (Todd, J., dissenting). The framers of the Pennsylvania Constitution and the people who voted to ratify it, most, if not all, of whom were subjects of the British Crown, "had firsthand experience . . . with how [that] right could be diminished through the granting of exclusive decision-making authority to officials empowered to search an individual's person, or the places where the individual kept [his] most important possessions, as to whether a search would be conducted[] and, if so, the time, place, and manner of the search." *Id.* at 144. The British Crown's customs officers, who were "charged with the collection of various excise taxes, imposed without the consent of the American colonists," "claimed the plenary power to forcibly enter homes, warehouses, and other places to search for smuggled goods, without any warrant or other judicial authorization." *Id.* These invasive searches "engendered great public opposition," and, in an effort to combat that opposition, colonial government officials granted "customs officers 'general writs of assistance' to authorize [the] searches." *Id.* at 144-45 (citation omitted). The court-issued writs "gave customs officers 'blanket authority to search where they pleased for goods imported in violation of the British tax laws.'" *Id.* at 145 (quoting *Stanford v. Texas*, 379 U.S. 476, 481 (1965)). Consequently, "colonists came to view the manner of the

customs officers' reliance on [the court-issued writs] to carry out sweeping searches as an even greater affront to their privacy." *Id.* In fact, "popular opposition became sufficiently strong that it impeded customs officials from carrying out their search and seizure duties, due to the fact that, once people in an area became aware of the presence of the officers, mobs of angry people would routinely appear and carry away the goods which the officers sought." *Id.* The British Parliament responded to these actions "by enacting the Townshend Revenue Act of 1767, which, to facilitate the obtaining of the writs . . . , empowered the highest court from each colony to issue them." *Id.* "This[, however,] engendered not only further opposition from the people[] but also from the high courts themselves." *Id.*

The opposition to and concerns with the arbitrariness of the British Crown's customs officers' searches and the use of court-issued writs of assistance to facilitate those searches was shared by Pennsylvania colonists. Indeed, in 1767, John Dickinson "forcefully attacked the writ in his influential publication" titled "Letters of a Pennsylvania Farmer." *Id.* Therein, "Dickinson argued that the power of general search conferred by the writs, which extended to all places of privacy, including the innermost confines of a colonist's home, had been recognized even in England as 'dangerous to freedom and expressly contrary to the common law'" and "that the writs were 'utterly destructive to liberty' since, unlike in England, the people here had no security 'against the undue exercise of this power by the [C]rown.'" *Id.* at 146 (citation omitted). This "Court's colonial predecessor, along with that of Connecticut, was unique in basing its refusal to issue such writs on the fact that they failed to restrict searches to only specific places and enumerated items and did not require an official to disclose to a judicial officer, prior to a search, his reasons for conducting it." *Id.* The "preference towards taking the decisional authority for the conduct and scope of searches away from the officials who would perform

them[] and placing [it] in the hands of a neutral judicial officer who could narrowly tailor the search to only certain areas and items[] based on the particular information presented to him" extended beyond our Court's colonial predecessor to our Provincial Assembly. *Id.* Indeed, Pennsylvania and Massachusetts "were the only colonies to supplant the authority of our own excise collectors to conduct warrantless excise searches with a requirement that the searches be conducted pursuant to supplementary search warrants, which authorized searches of places based on information provided by the official on where he thought goods on which duty had not been paid might be found." *Id.*

This history demonstrates that the right to be free from arbitrary searches and to abolish the use of general warrants of assistance was of "vital importance to the drafters of [Pennsylvania's] first Constitution." *Id.*; *see also Edmunds*, 586 A.2d at 897. In fact, "the members of our inaugural constitutional convention . . . immediately formed a 'Bill of Rights Committee[]' and assigned as one of its primary tasks the drafting of protections for the 'freedom from arbitrary search[es].'" *Gary*, 91 A.3d at 146 (Todd, J., dissenting) (citation omitted). The result: Clause 10 and, later, Article I, Section 8. Clause 10, specifically its requirement of prior authorization for searches—*i.e.*, warrants issued by neutral third parties and supported by probable cause—"represents a deliberate and affirmative repudiation of the . . . judicially unsupervised search practices [that] the framers found so repugnant." *Id.* at 147. "[I]n accordance with this strong historical tradition [to be free from arbitrary searches], the warrant requirement of Article I, Section 8 should be given the broadest reasonable application to searches conducted by government officials in this Commonwealth." *Id.* at 148.

Shifting specifically to open fields, English common law's treatment of an intrusion onto private land as a trespass is entirely consistent with a determination that the framers

of Pennsylvania's original Constitution intended for the right to be free from arbitrary searches to extend beyond the curtilage to open fields. As William Blackstone explained:

> Every unwarrantable entry on another's soil the law entitles a trespass by breaking his close; . . . For every man's land is in the eye of the law inclosed and set apart from his neighbour's: and that either by a visible and material fence, as one field is divided from another by a hedge; or, by an ideal invisible boundary, existing only in the contemplation of law, as when one man's land adjoins to another's in the same field.

3 William Blackstone, *Commentaries on the Laws of England* 209-10 (1765). Similarly, in *Entick v. Carrington*, 19 Howell's State Trials 1029 (CP 1765), a case brought by a "pamphleteer suspected of writing seditious documents" against "four of the King's messengers[,] who had acted pursuant to a warrant 'to search for and seize the [pamphleteer] and his books and papers'" and who broke into and damaged the pamphleteer's home, Lord Camden stated:

> By the laws of England, every invasion of private property, be it ever so minute, is a trespass. No man can set his foot upon my ground without my licence, but he is liable to an action, though the damage be nothing; which is proved by every declaration in trespass, where the defendant is called upon to answer for bruising the grass and even treading upon the soil.

Richard A. Epstein, *Entick v. Carrington and Boyd v. United States: Keeping the Fourth and Fifth Amendments on Track*, 82 U. Chi. L. Rev. 27, 28-29 (2015). Ultimately, Lord Camden determined that the King's messengers were liable to the pamphleteer for their trespass. *Id.* at 29-30.

Importantly, Pennsylvania adopted certain aspects of English common law—including its treatment of an invasion of private land as a trespass—as its own. *See* 1 Pa. C.S. § 1503(a) ("The common law and such of the statutes of England as were in force in the Province of Pennsylvania on May 14, 1776[,] and which were properly adapted to the circumstances of the inhabitants of this Commonwealth shall be deemed to have been in force in this Commonwealth from and after February 10, 1777."). Early Pennsylvania

lawmakers then adapted that common law to meet the changing circumstances of Pennsylvania colonists, striking a balance between a landowner's "unqualified right to exclude people" from his land and the need for a distinction between enclosed and unenclosed land as people settled in Pennsylvania. Brian Sawers, *The Right to Exclude From Unimproved Land*, 83 Temple L. Rev. 665, 675-79 (2011); *see, e.g.*, Act of November 27, 1700 (2 St.L. 70, Ch. 56, § 1) (providing that "all corn fields and grounds kept for inclosures . . . shall be well fenced" and that "whosoever, not having their grounds inclosed with . . . sufficient fence[s] . . . , shall hurt, kill or do damage to any [livestock] of any other person, by hunting or driving them out of or from the said grounds, shall be liable" to owner thereof); Act of August 26, 1721 (3 St.L. 254, Ch. 246, § 3) (establishing that no person "shall . . . carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner"). Given that the English common law forbade intrusions onto private land, even those committed by individuals acting on behalf of the British Crown, and that Pennsylvania adopted that common law as its own and then adapted it to meet its circumstances, there is no reason to believe that the antipathy of the framers of Pennsylvania's original Constitution for arbitrary searches did not extend to open fields, at least those open fields that are improved, enclosed, and/or marked to exclude intruders.

*Russo* aside, however, there is a dearth of interpretive case law from this Court relative to the application of Article I, Section 8 to open fields. Our research uncovered three cases that could be of potential relevance, all of which predate *Russo*: *Treftz*, *Oglialoro*, and *Gordon*. With respect to *Treftz*, the Commission and Warden Gritzer suggest, albeit in connection with their *stare decisis* arguments, that this Court invoked the open fields doctrine "as a reason for refusing to suppress the discovery of a corpse that had been used as evidence to secure a conviction for first-degree murder."

(Commission and Warden Gritzer's Br. at 18.) They continue that, because "the defendant sought to suppress the discovery of the body pursuant to both the Fourth Amendment and [Article I,] Section 8[,] . . . this Court's application of the open fields doctrine disposed of the defendant's state constitutional claim as well as his federal constitutional claim." (*Id.* at 18 n.5 (emphases omitted) (internal quotation marks omitted).) In making these arguments, however, the Commission and Warden Gritzer ignore two key points.

First, in *Treftz*, the trial court denied the defendant's motion to suppress the deceased's body, which was discovered pursuant to a defective search warrant in the woods of certain real property owned and possessed by individuals that were not the defendant approximately 148 yards from the backyard of a small farmhouse, due to a lack of standing. *Treftz*, 351 A.2d at 266-68. The trial court went further, however, and concluded that, even if the defendant had standing, it did not believe that the search and seizure constituted an unreasonable invasion of privacy. *Id.* at 268. In affirming the defendant's judgment of sentence, this Court concluded that the interest the defendant asserted, "that of an occasional and transient visitor . . . , who last visited . . . three weeks prior to the illegal search, and who had no remaining personal belongings on the property, [fell] well below the legal standards to justify any reasonable expectations of privacy" and, therefore, the defendant did not have standing to attack the validity of the search and the subsequent seizure of the deceased's body—*i.e.*, the defendant "had effectively 'abandoned' all cognizable interest in the searched premises." *Id.* at 269, 270. This Court also went further and concluded that, "inasmuch as the protection of the Fourth Amendment against unreasonable searches and seizures does not extend to 'open fields,' there was no unreasonable search." *Id.* at 271. Both the trial court's and this Court's statements relative to the lack of an unreasonable invasion of privacy and/or an

unreasonable search given that the protections afforded by the Fourth Amendment do not extend to open fields constitute dicta, because such statements were wholly unnecessary to resolve the defendant's suppression motion given his lack of standing. As such, we cannot rely on *Treftz* as a statement/conclusion as to the applicability of the open fields doctrine in Pennsylvania. Second, while the defendant may have sought suppression of the deceased's body as a violation of both the Fourth Amendment and Article I, Section 8, this Court did not discuss Article I, Section 8 and/or whether Article I, Section 8 provides the same or greater protection than that of the Fourth Amendment. For these reasons, *Treftz* does not, as the Commission and Warden Gritzer suggest, stand for the proposition that Pennsylvania's interpretative case law supports a conclusion that the protections afforded by Article I, Section 8 do not extend to open fields.

Turning to *Oglialoro*, the defendant in that case filed a motion to suppress marijuana seized from his property on the basis that the warrantless helicopter search of his pole barn at a height of 50 feet interfered with his reasonable expectation of privacy. *Oglialoro*, 579 A.2d at 1289-90. The trial court denied the defendant's motion, and, following his conviction for various drug offenses, the defendant appealed to the Superior Court. *Id.* The Superior Court held that the marijuana was suppressible and, therefore, reversed the defendant's judgment of sentence and granted him a new trial. *Id.* at 1290. In so doing, the Superior Court relied upon federal jurisprudence—*i.e.*, the protections afforded by the Fourth Amendment. *Id.* (citing *People v. Sabo*, 230 Cal. Rptr. 170, 176 (Cal. Ct. App. 1986) (concluding that "helicopter views from non-navigable airspace of the marijuana glimpsed through the missing panels of the greenhouse constituted an unreasonable invasion of respondents' expectation of privacy, and the seizure of the contraband under the warrant issued pursuant to the helicopter viewing violated respondents' Fourth Amendment rights"), *cert. denied*, 481 U.S. 1058 (1987)). This Court

granted allocatur to consider the propriety of the Superior Court's conclusion that the suppressed evidence was obtained through an illegal search.  *Id.*  Ultimately, this Court concluded:  (1) "[b]y installing a transparent, or at most translucent, roof, [the defendant] readily allowed exposure of the contents of the structure to the sunlight outside and also knowingly exposed his activities therein to persons lawfully operating aircraft over his property;" and (2) while curtilage is often afforded greater privacy protection than an open field due to its proximity to one's home, such protection is not absolute and does not bar police observation, so "long as the police have a right to be where they are[] and the activity is clear and visible."  *Id.* at 1292.  This Court, nevertheless, affirmed the Superior Court's decision because "the helicopter's presence at 50 feet above the barn represented a hazard to persons and property on the ground and . . . the conduct of the police in flying at [that] level was unreasonable."  *Id.* at 1294.

The Commission and Warden Gritzer cite *Oglialoro* for the proposition that "more than three decades ago" this Court recognized that "the curtilage is 'afforded a greater privacy protection than an open field because of the traditional significance of the home as a haven from governmental intrusions.'"  (Commission and Warden Gritzer's Br. at 31 (emphasis omitted) (citation omitted).)  In setting forth that proposition, however, the Commission and Warden Gritzer fail to acknowledge that this Court's decision in *Oglialoro* was based entirely on the Fourth Amendment and its interpretative case law.  Indeed, this Court did not cite, reference, or discuss Article I, Section 8.  Additionally, *Oglialoro* did not involve open fields, as the pole barn subject to the search was located within the curtilage.  For these reasons, *Oglialoro*, like *Treftz*, does not support a conclusion that the protections afforded by Article I, Section 8 do not extend to open fields.

Finishing with *Gordon*, the defendant in that case, who was squatting in an abandoned and dilapidated house, filed a motion to suppress certain evidence that was

found within that house following a warrantless search. *Gordon*, 683 A.2d at 255. The trial court denied the defendant's motion on the basis that the warrantless search of the house, namely the dining room in which the defendant had been living, did not violate his rights under the Fourth Amendment or Article I, Section 8. *Id.* Following his subsequent trial and conviction, the defendant appealed to the Superior Court, which reversed the trial court's denial of suppression, vacated the defendant's judgment of sentence, and remanded for a new trial. *Id.* at 255-56. In so doing, the Superior Court "held that the police violated [the defendant's] right to be free from unreasonable governmental searches and seizures under Article I, Section 8." *Id.* at 256. This Court granted the Commonwealth's petition for allowance of appeal to determine "whether an individual has a reasonable and legitimate expectation of privacy in a room of an abandoned house under Article I, Section 8." *Id.* (footnote omitted). In addressing that issue, this Court set forth the two-part test that courts use to determine whether the police have violated an individual's rights under Article I, Section 8. *Id.* "That test requires a person to (1) have exhibited a subjective expectation of privacy and (2) have demonstrated that the expectation is one that society is prepared to recognize as reasonable and legitimate." *Id.* Applying that test, this Court concluded that, while the defendant demonstrated that "he had a subjective expectation of privacy in the dining room of the abandoned house" given "the presence of a sheet separating [that] room from the rest of the house, electricity, a mattress[,] and a television," the defendant failed to establish that such expectation was legitimate—*i.e.*, "some possessory-based factor from which [this Court] could find a reasonable expectation of privacy." *Id.* at 257-58. This Court explained that "a defendant can establish a legitimate expectation of privacy, despite lacking a common-law interest in the real property, if he demonstrates certain characteristics of ownership[, a]mong the critical . . . of [which] is the right to exclude others from the

premises." *Id.* at 258. To that end, this Court disagreed with the Superior Court that the defendant sustained his burden of demonstrating that "the sheet served to exclude others from the dining room," explaining that the defendant did not present any evidence to demonstrate that "he excluded other people living in the house from the dining room" or that he hung the sheet himself in an effort to exclude others. *Id.* This Court continued that the defendant's "claimed exclusion of the public from the dining room [was] implausible because the evidence revealed that the house had an unlocked, open exterior door." *Id.* Given that the defendant failed to satisfy his burden, this Court concluded that the warrantless search of the house did not violate his rights under Article I, Section 8. *Id.* at 259.

Although it is not an open fields case, *Gordon* demonstrates that this Court has interpreted Article I, Section 8 to provide privacy protection to real property if the owner and/or possessor thereof has demonstrated a legitimate expectation of privacy by taking steps to exclude intruders therefrom. Thus, on at least some basic level, *Gordon* is helpful in answering the question of whether Article I, Section 8 affords greater protection than the Fourth Amendment in the context of open fields.

Taking a step back, we cannot ignore that, outside the context of open fields, this Court has "declared that '[t]he notion of privacy in Article I, [Section] 8 is greater than that of the Fourth Amendment,' and, when compared to federal courts, Pennsylvania courts 'have given greater weight to an individual's privacy interests when balancing the importance of privacy against the needs of law enforcement.'" *Arter*, 151 A.3d at 157-58 (first alteration in original) (quoting *Commonwealth v. McCree*, 924 A.2d 621, 626-27 (Pa. 2007)). Indeed, this Court has concluded on numerous occasions that Article I, Section 8 provides greater privacy protection than the Fourth Amendment. *See, e.g.*, *Alexander*, 243 A.3d at 207 (holding that Article I, Section 8 requires both probable cause

and exigent circumstances to justify warrantless search of vehicle); *Arter*, 151 A.3d at 151 (holding that Article I, Section 8 commands application of exclusionary rule to parole and probation revocation hearings); *Commonwealth v. Martin*, 626 A.2d 556, 561 (Pa. 1993) (holding, *inter alia*, that Article I, Section 8 authorizes canine sniff search of person only when police have probable cause to believe that such search will produce contraband or evidence of crime); *Edmunds*, 586 A.2d at 888 (holding that adoption of "good faith" exception to exclusionary rule would frustrate guarantees set forth in Article I, Section 8); *Sell*, 470 A.2d at 469 (holding that person charged with possessory offense must be afforded "automatic standing" to challenge admissibility of evidence alleged to be fruit of illegal search and seizure).

For all of the above-stated reasons, we conclude that Article I, Section 8's history, like its text, supports an interpretation of Article I, Section 8 that is broader than the Fourth Amendment with respect to the expectation of privacy that Pennsylvania citizens enjoy relative to open fields. As such, we turn to the third prong of the *Edmunds* analysis and examine case law from other jurisdictions.

### c. Case Law from Other Jurisdictions

The third prong of the *Edmunds* analysis requires us to consider relevant case law from other jurisdictions. In their brief to this Court, the Hunting Clubs cite several decisions from states rejecting the federal open fields doctrine under state constitutional provisions similar to Article I, Section 8. According to the Hunting Clubs, the high courts from three states that have constitutional provisions that protect "possessions" from unreasonable searches and seizures—Mississippi, Tennessee, and Vermont—and the high courts from four states that have constitutional provisions that provide more robust privacy protections to their citizens than that afforded by the Fourth Amendment—

Washington, Oregon, New York, and Montana—have all rejected the federal open fields doctrine. We consider each of these cases in turn.

In *Falkner v. State*, 98 So. 691 (Miss. 1924), the Mississippi Supreme Court considered whether the warrantless search of a wooded area located approximately 300 yards from a residence violated the property owner's privacy rights guaranteed by Article 3, Section 23 of the Mississippi Constitution, which provides, in relevant part, that "[t]he people shall be secure in their persons, houses, and *possessions*, from unreasonable seizure or search." *Falkner*, 98 So. at 691-92 (emphasis added) (quoting Miss. Const. art. 3, § 23). In analyzing that provision, the court explained:

> The security of the section is of the persons, houses, and possessions. If the section meant only to protect the persons and houses the words "and possessions" would be superfluous and meaningless. The rule is clear that in construing Constitutions every word is to be given some meaning. The words "and possessions" indicate clearly something other than houses and persons. The term "possessions" is a very comprehensive term, and includes practically everything which may be owned, and over which a person may exercise control.

*Id.* at 692. After consulting various dictionary definitions, the court held that "possessions," as used in Article 3, Section 23, is broader than "papers and effects," as used in the Fourth Amendment, and includes "all of the property of the citizen," including, in this case, the wooded land located approximately 300 yards from the property owner's residence. *Id.* at 692-93. As a result, the court concluded that the warrantless search of that wooded land was unconstitutional. *Id.* at 693.

In *Welch v. State*, 289 S.W. 510 (Tenn. 1926), the Tennessee Supreme Court considered whether the warrantless search of a wire-fenced lot located more than 300 yards from a residence that was used to confine livestock violated the property owner's rights under Article I, Section 7 of the Tennessee Constitution, which provides, in pertinent part, "[t]hat the people shall be secure in their persons, houses, papers and

*possessions*, from unreasonable searches and seizures." *Welch*, 289 S.W. at 510 (emphasis added) (quoting Tenn. Const. art. 1, § 7). The court explained:

> [T]he word "possessions" was added for a purpose, and means more than houses or mansions, something in addition thereto. We see no reason why this word should not be given the ordinary meaning ascribed to it by lexicographers. In our opinion, it refers to property, real or personal, actually possessed or occupied.

*Id.* After consulting multiple dictionaries and literary sources, the court reasoned that the framers of Tennessee's Constitution "must have intended the word 'possessions' to have included more than the 'curtilage.'" *Id.* at 510-11. The court could not believe that the framers "intended to license officers to go upon the property of one in actual possession and occupancy and promiscuously search about with the hope or expectation of finding contraband goods[] but, on the other hand, . . . proposed to prohibit such conduct by the [constitutional] provision in question." *Id.* at 511.

In *Kirchoff*, the Vermont Supreme Court held that the warrantless search of posted land consisting of woods, swamp, and meadows in an isolated area violated Chapter I, Article 11 of the Vermont Constitution, which provides, in relevant part, "[t]hat the people have a right to hold themselves, their houses, papers, and *possessions*, free from search or seizure." *Kirchoff*, 587 A.2d at 990-91 (emphasis added) (quoting Vt. Const. ch. 1, art. 11). In so holding, the court acknowledged that the warrantless search of open fields would be permissible under the Fourth Amendment but ultimately concluded that Chapter I, Article 11 provided greater protection than the Fourth Amendment in the context of open fields. *Id.* at 990-93. The court, *inter alia*, explained that its research suggested that, "at the time the Vermont Constitution was adopted, the word 'possessions' in certain contexts would have included all real estate over which an individual exercised a certain degree of control." *Id.* at 991. The court cautioned, however, that, while "people undoubtedly have a possessory interest in the land they own

or occupy, not all state intrusions onto private lands [would] violate [Chapter I,] Article 11." *Id.* at 993. Consequently, the court "define[d] the contours of the right to privacy in open fields by determining when activities in open fields are sufficiently private to warrant constitutional protection and when, on the other hand, they are sufficiently public not to deserve protection." *Id.* After setting forth its own standard for determining the legitimacy of a possessor's expectation of privacy, which diverged, at least in some respects, from the standard established in *Katz*, the court reasoned:

> By no stretch of the imagination could the officers reasonably conclude, under the standards we have set out here, that their "walk-on" search was permissible. Given the extensive posting of the land, [the property owner's] intent to exclude the public was unequivocal. On these facts, we find that the officers' walk over [the property owner's] logging roads and through his woods violated his right to privacy under [Chapter I,] Article 11.

*Id.* at 996. Notably, in *State v. Dupuis*, 197 A.3d 343, 348 (Vt. 2018), the Vermont Supreme Court applied its holding from *Kirchoff* to conclude that Chapter I, Article 11, which, to reiterate, "protects against warrantless searches of 'open fields' when the landowner objectively demonstrates his or her intent for privacy through actions such as posting 'no trespass' signs," "provides the same protection when the warrantless search is for the purpose of enforcing hunting laws." *Dupuis*, 197 A.3d at 344.

In *State v. Myrick*, 688 P.2d 151 (Wash. 1984), the Washington Supreme Court considered whether aerial surveillance of open fields at an altitude of 1,500 feet violated Article 1, Section 7 of the Washington Constitution, which provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law" and "requires a warrant for arrests, searches and seizures subject only to a few, limited exceptions." *Myrick*, 688 P.2d at 152-53 (quoting Wash. Const. art. 1, § 7). The court reasoned that "the unique language" of Article 1, Section 7, which "mandates protection of the person in his private affairs," provides greater protection than the Fourth Amendment, which fails "to explicitly provide protection for anything other than a person,

his house, papers and effects." *Id.* at 153, 155. The court, therefore, explained that "the question [of] whether all warrantless aerial surveillance violates [Article 1, Section 7] is not answered by looking to the nature of the property viewed, alone;" instead, that is "but one factor in determining whether the aerial surveillance has unconstitutionally intruded into a person's 'private affairs.'" *Id.* at 155. Ultimately, the court concluded that, even though the property owner "had taken many precautions against intrusion onto his property," including "a fence, numerous no trespassing signs, electronic sensors, and an observation platform to detect intruders," the aerial surveillance was not a search because the property owner's marijuana gardens "were identifiable with the unaided eye from the lawful and nonintrusive altitude of 1,500 feet above ground level." *Id.* at 152, 155. Remarkably, in *Johnson*, the Washington Court of Appeals cited *Myrick* to support its holding that the warrantless entry onto bounded and posted property located outside the curtilage constituted an unreasonable intrusion into the landowners' private affairs. *Johnson*, 879 P.2d at 992-94.

In *State v. Dixson*, 766 P.2d 1015 (Or. 1988), the Oregon Supreme Court considered whether Article I, Section 9 of the Oregon Constitution, which provides, in germane part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure," protects private land located outside of the curtilage. *Dixson*, 766 P.2d at 1016-17 (quoting Or. Const. art. I, § 9). While recognizing that the text of Article I, Section 9 is similar to that of the Fourth Amendment, the court concluded that the scope of Article I, Section 9 "is broader than a literal reading of its terms" and "protects the privacy of the individual from certain kinds of governmental scrutiny." *Id.* at 1022. The court continued that, "[i]f the individual has a privacy interest in land outside the curtilage of his dwelling, that privacy interest will not go unprotected simply because of its location." *Id.* Instead, the court

explained, the issue of "whether governmental intrusions into privately owned land would significantly impair an individual's interest in freedom from scrutiny" must be determined on a case-by-case basis:

> An individual's privacy interest in land he or she has left unimproved and unbounded is not sufficient to trigger the protections of Article I, [S]ection 9. Thus, it is not sufficient that the property in question is privately owned, or that it is shielded from view by vegetation or topographical barriers, because those features do not necessarily indicate the owner's intention that the property be kept private. A person who wishes to preserve a constitutionally protected privacy interest in land outside the curtilage must manifest an intention to exclude the public by erecting barriers to entry, such as fences, or by posting signs.

*Id.* at 1023-24. Applying those principles to the facts of this particular case, however, the court concluded that, because the property owners had only blocked access to the property with cables and posted "[n]o [h]unting" signs, "there was no objective reason for the officers to believe that, in addition to the restriction on hunting, other uses such as hiking were forbidden" and, therefore, the officers' actions did not violate Article I, Section 9. *Id.* at 1024.

In *Scott*, the New York Court of Appeals held that the open fields doctrine does not adequately protect the fundamental rights afforded by Article I, Section 12 of the New York Constitution, which provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." *Scott*, 593 N.E.2d at 1330; N.Y. Const. art. I, § 12. In so doing, the court reasoned that New York citizens were entitled to more protection than that offered by the open fields doctrine. *Scott*, 593 N.E.2d at 1335. The court explained:

> A constitutional rule which permits [s]tate agents to invade private lands for no reason at all—without permission and in outright disregard of the owner's efforts to maintain privacy by fencing or posting signs—is one that we cannot accept as adequately preserving fundamental rights of New York citizens. Such a rule is contrary to New York decisions, particularly those adopting the *Katz* rationale in search and seizure cases.

*Id.* Thus, the court concluded that, "where landowners fence or post '[n]o [t]respassing' signs on their private property or, by some other means, indicate unmistakably that entry is not permitted, the expectation that their privacy rights will be respected and that they will be free from unwanted intrusions is reasonable." *Id.* at 1338. Because the property in question was posted with "no trespassing" signs and there was no evidence that the landowner permitted others onto his land and/or failed to manifest a subjective expectation of privacy, the court determined that the warrantless entries on the rural, hilly, undeveloped, and uncultivated fields and woodlands violated Article I, Section 12. *Id.* at 1330, 1338.

In *Bullock*, the Montana Supreme Court considered whether Article II, Section 11 of the Montana Constitution, which provides, in pertinent part, that "[t]he people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures," prohibits warrantless searches and seizures of posted, private land located beyond the curtilage. *Bullock*, 901 P.2d at 69 (quoting Mont. Const. art. II, § 11). Relying on *Dixson*, *Scott*, and *Johnson*, the court explained that, "[l]ike [its] sister states, Montana has a strong tradition of respect for the right to individual privacy." *Id.* at 72-75. Consequently, the court concluded that "a person may have an expectation of privacy in an area of land that is beyond the curtilage which the society of this [s]tate is willing to recognize as reasonable, and that where that expectation is evidenced by fencing, '[n]o [t]respassing,' or similar signs, or 'by some other means [which] indicate[s] unmistakably that entry is not permitted,' entry by law enforcement officers requires permission or a warrant." *Id.* at 75-76 (some alterations in original) (internal citation omitted). Applying that rationale to the specific facts of the case, the court determined that, because the landowner "took numerous precautions to ensure that others would not enter his property without permission," the landowner's expectation of privacy was reasonable and,

therefore, the warrantless entry onto the landowner's property constituted an unreasonable search in violation of Article II, Section 11. *Id.* at 76.

The Commission and Warden Gritzer, in their brief, rely heavily on the Kentucky Court of Appeals' decision in *Brent*. In so doing, the Commission and Warden Gritzer point out that "this Court's construction of [Article I,] Section 8 in *Russo* mirrored the construction of Section 10 of the Kentucky Constitution in *Brent*." (Commission and Warden Gritzer's Br. at 33.) They continue that, "[i]n the century since [it] was decided," *Brent* "has continued to govern cases involving the reach and application of Section 10." (*Id.* at 34.) The Commission and Warden Gritzer suggest that "[t]he Kentucky Supreme Court's continued application of *Brent* is especially significant because Kentucky's Bill of Rights 'was taken almost verbatim' from the Pennsylvania Constitution of 1790." (*Id.* (citation omitted).) The Commission and Warden Gritzer also cite decisions from the high courts of Michigan and New Hampshire, claiming that those courts have construed "possessions" to mean the same thing as "effects." They then claim that this Court's adoption of the open fields doctrine in *Russo* was also consistent with decisions rendered by courts in Nebraska, Indiana, Texas, Missouri, Oklahoma, New Jersey, and California. Arguably, in doing so, they rely on the decisions that this Court cited with favor in *Russo*. The Commission and Warden Gritzer then direct our focus to a North Dakota Supreme Court case, which they claim rejected the Hunting Clubs' argument in this case. We will discuss each of these decisions separately.

In *Brent*, the Kentucky Court of Appeals considered whether the warrantless entry onto private land located roughly 350 to 400 yards from the landowner's residence in a wooded area violated Section 10 of Kentucky's Constitution, which provides, in pertinent part, that "[t]he people shall be secure in their persons, houses, papers and *possessions* from unreasonable search and seizure." *Brent*, 240 S.W. at 46-47 (emphasis added)

(quoting Ky. Const. § 10). The court recognized the textual distinction between Section 10 and the Fourth Amendment but reasoned "[w]hether these words, as so used, include like or different kinds of property has not been decided, but, with their common purpose in view, it is not a strained construction to say that they have the same essential meaning." *Id.* at 47. The court opined that "the doctrine of *ejusdem generis* applie[d] and that, in construing the term 'possessions,' [it] must have regard for the particular and specific words preceding it and confine its application to things of like kind." *Id.* at 48. Applying the *ejusdem generis* doctrine, the court explained:

> [T]he word "possessions" should be deemed to have been used, not in the broad sense which it might bear if standing alone, but in the sense of its relationship to the words of more definite and particular meaning which precede it and with which it is associated and to be construed. If considered in its broadest sense it includes "houses" and "papers," and no effect whatever could be given to those words which would result in the violation of a well-known rule of statutory construction. Why use the words "houses" and "papers," if the word "possessions" is to be construed as meaning every species of property in one's actual or constructive possession? It is not to be presumed that the Constitution makers intended the word to be all-embracing and inclusive and in effect to nullify and render superfluous other words associated with it. In our opinion it was intended to mean the intimate things about one's person, like in kind to those previously denominated[.]

*Id.* For these reasons, the court concluded that the warrantless entry at issue did not violate Section 10. *Id.* at 49.

The Hunting Clubs insist that the Kentucky Court of Appeals made the same errors in *Brent* that this Court made in *Russo* by applying the doctrine of *ejusdem generis* "to Kentucky's search clause without first defining the original meaning of 'possessions'" and by rejecting a reading of the term "possessions" to include land. (Hunting Clubs' Reply Br. at 8-9.) In the Hunting Clubs' view, "[t]he mere fact that *Brent* made *Russo*'s errors first does not justify repeating them" because, while Kentucky's Bill of Rights may have been inspired by Pennsylvania's Constitution, "this case is about how Pennsylvanians

understood their Constitution" at the time of its adoption, "not how Kentucky courts understood theirs 146 years later." (*Id.* at 9 (emphasis omitted).)  On these points, we agree with the Hunting Clubs and find no reason to follow *Brent* simply because:  (1) the framers of the Kentucky Bill of Rights may have borrowed language from the 1790 version of the Pennsylvania Constitution; and (2) this Court's construction of Article I, Section 8 in *Russo* may have mirrored the Kentucky Court of Appeals' construction of Section 10 in *Brent*.   Instead, we will draw our own conclusions as to *Brent*'s relevancy to our consideration of whether Article I, Section 8 provides greater protection than the Fourth Amendment in the context of open fields.

In *People v. Smith*, 360 N.W.2d 841 (Mich. 1984), the Michigan Supreme Court considered whether the defendant had standing to challenge the seizure of a trailer parked in the fenced lot of an abandoned restaurant.  *Smith*, 360 N.W.2d at 842-45.  In answering that question, the court was called upon to consider whether Article 1, Section 11 of the Michigan Constitution, which provides, in relevant part, that "[t]he person, houses, papers and *possessions* of every person shall be secure from unreasonable searches and seizures," should be interpreted more liberally than the Fourth Amendment.  *Id.* at 848 (emphasis added) (quoting Mich. Const. art. 1, § 11). Ultimately, the court noted that, while it has on occasion concluded that Article 1, Section 11 provides greater protection to its citizens than the Fourth Amendment, it has never concluded that the difference in wording between the two "mandates a higher standard in every case."  *Id.*  The court continued:

> [W]e are not even convinced that the difference in wording is . . . a difference in meaning as it affects this case.  The terms "possessions" and "effects" are virtually identical in meaning and are often used interchangeably. Webster's New Collegiate Dictionary (2d ed.), p. 262, supports this conclusion in that it defines "effects" as "[g]oods; possessions[.]"

*Id.* at 849 (emphasis omitted). For these reasons, the court rejected the defendant's argument that the difference in wording required it to adopt an "automatic standing" rule and, instead, adopted a "reasonable expectation of privacy" test to determine whether a defendant has standing to attack the propriety of a search or seizure. *Id.* at 849-53. That test requires the court to determine whether, based on the totality of the circumstances, "the defendant had an expectation of privacy in the object of the search and seizure and whether that expectation is one that society is prepared to recognize as reasonable." *Id.* at 852-53. Because the record was inadequate to answer that question, the court remanded the matter to the trial court for further proceedings. *Id.* at 253.

In *Pinder*, the New Hampshire Supreme Court concluded that Part I, Article 19 of the New Hampshire Constitution, which provides, in germane part, that "[e]very subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his *possessions*," was not designed to protect open fields—*i.e.*, "unoccupied and undeveloped lands somewhat removed from dwellings and other protected structures." *Pinder*, 514 A.2d at 1244, 1246 (emphasis added) (quoting N.H. Const. pt. I, art. 19). Citing to *Falkner*, *Brent*, *Hester*, and *Oliver*, the court reasoned that, while it interprets the term "possessions" broadly, it does not interpret it so broadly that it encompasses open fields. *Id.* at 1245-46. Because the evidence sought to be suppressed was discovered in "open fields lying outside the defendant's curtilage," the court concluded that the warrantless search did not offend Part I, Article 19. *Id.* at 1246.

In *Havlat*, the Nebraska Supreme Court considered whether the warrantless entry onto an open field—*i.e.*, private land located more than one-quarter mile from farm buildings near a small creek that was surrounded by a heavy growth of trees and underbrush—violated Article I, Section 7 of the Nebraska Constitution, which provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers,

and effects against unreasonable searches and seizures shall not be violated." *Havlat*, 385 N.W.2d at 439-41; Neb. Const. art. I, § 7. Applying the holding of one of its prior decisions, which was based on the Fourth Amendment and "merely anticipated *Oliver*," to the Nebraska Constitution, the court held:

> [A] person's capacity to claim the protection of [A]rticle I, [Section] 7. . . as to unreasonable searches and seizures, like its counterpart, the [F]ourth [A]mendment . . . , depends upon whether the person who claims such protection has a legitimate expectation of privacy in the invaded place. Further, the open fields doctrine of *Hester* . . . is applicable under our Constitution.

*Havlat*, 385 N.W.2d at 440 (citing *State v. Cemper*, 307 N.W.2d 820 (Neb. 1981)). As such, the court concluded that no constitutional protection attached to the defendant's activities in his open fields and, therefore, the warrantless search thereof did not offend Article I, Section 7. *Id.* at 441.

In *Williams*, the Indiana Supreme Court concluded that no warrant was required to search the private land in question or to seize the evidence located thereon because, *inter alia*, Article 1, Section 11 of the Indiana Constitution, which provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated," "does not make necessary the obtaining of a search warrant to enable officers to search fields, woods, or land which is some distance from a house or dwelling." *Williams*, 166 N.E. at 663; Ind. Const. art. 1, § 11.

In *Wolf*, the Texas Court of Criminal Appeals considered whether the warrantless entry onto private, mostly undeveloped land located approximately three-fourths of a mile from the dwelling house violated Article 1, Section 9 of the Texas Constitution, which provides, in germane part, that "[t]he people shall be secure in their persons, houses, papers and possessions, from all *unreasonable seizures or searches*." *Wolf*, 9 S.W.2d at 350 (emphasis in original) (quoting Tex. Const. art. 1, § 9). Focusing on whether the

search was unreasonable, rather than defining the term "possessions," and citing to, *inter alia*, *Brent*, *Zugras*, and *Hester*, the court reasoned:

> It is apparent from the precedents that the immunity from interference is founded upon the desire to give effect to the idea that "a man's home is his castle"; that an unreasonable search is one which trenches upon the peaceful enjoyment of the house in which he dwells or in which he works and does business, and those things connected therewith, such as gardens, outhouses, and appurtenances necessary for the domestic comfort of the dwelling house or that in which the business is conducted. In its limitations, the immunity intended is analogous to that which applies to the curtilage of which the common law speaks, and does not render unreasonable the search of woods, fields, ravines, or open spaces not so connected with the place of business or dwelling, though owned by the same individual.

*Id.* at 350-51. As such, the court concluded that the warrantless entry at issue did not offend Article 1, Section 9. *Id.* at 351.

In *Zugras*, the Missouri Supreme Court concluded that the search of a woodland area located approximately 150 yards from a residence was not unreasonable or in violation of Article 2, Section 11 of the Missouri Constitution,[21] which, at that time, provided, in pertinent part, "that the people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures." *Zugras*, 267 S.W. at 806 (quoting Mo. Const. art. 2, § 11). In so holding, the court appears to have relied almost exclusively on the Kentucky Court of Appeals' decision in *Brent*. *See id.*

In *Ratzell*, the Oklahoma Criminal Court of Appeals considered whether a search and seizure was unreasonable under Article II, Section 30 of the Oklahoma Constitution, which provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be

---

[21] Since the Missouri Supreme Court issued its decision in *Zugras*, the Missouri Constitution has undergone multiple revisions. The general prohibition against unreasonable searches and seizures appears to now be set forth in Article I, Section 15 of the Missouri Constitution.

violated." *Ratzell*, 228 P. at 167 (quoting Okla. Const. art. II, § 30). In concluding that it was not, the court reasoned:

> We think it would be stretching the meaning and purpose of this provision of our Constitution too far to hold that [the] terms [persons, houses, papers, and effects] include a place in an unfrequented ravine or pasture, not near the place of abode, where a seizure would in no way disturb the privacy of the home or the business or occupation of the suspected violator of the law. These constitutional and statutory provisions were not designed to protect bootleggers, rum runners, or other law violators. They were designed for the protection of innocent persons against arbitrary and unreasonable searches that invade the privacy of the ordinary affairs of life. One who goes into the woods, thickets or pastures of sparsely settled communities in search of contraband goods is not necessarily a trespasser, and a search for outlawed goods in such places may be "reasonable" with the meaning of the Constitution.

*Id.* at 168.

In *Gates*, the New Jersey Superior Court considered whether the warrantless entry onto private lands consisting of a mixture of wetlands, fields, and forests by conservation officers investigating suspected violations of New Jersey's fish and game laws was unreasonable and in violation of Article I, Paragraph 7 of the New Jersey Constitution, which provides, in germane part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *Gates*, 703 A.2d at 696-97; N.J. Const. art. I, ¶ 7. After weighing the strong public interest served by the enforcement of laws regulating hunting against the privacy intrusion that the open fields doctrine would have upon individual liberties, the court concluded that it could not state that "the open fields doctrine provide[s] inadequate protection for [New Jersey's] citizenry; or that the public policy reasons in favor of the doctrine are outweighed by the resulting intrusion upon individual liberties; or[] that there are sound policy reasons for departing from United States constitutional law." *Gates*, 703 A.2d at 701. Consequently, the court felt constrained to follow *Oliver* and to "hold

that the open fields doctrine applies under the facts of this case and that no violation of Article I, Paragraph 7 . . . has occurred." *Id.* The court continued, however, that, even if it were to apply "an *ad hoc* test . . . based upon the adequacy of efforts made to establish a right of privacy by private land[]owners," the efforts made by the landowner in this case "to keep people off the property were, at best, feeble and not reasonably calculated to provide the expectation of privacy now claimed by the defendants." *Id.*

In *Betchart*, the California Court of Appeal for the First District considered whether Article I, Section 13 of the California Constitution, which provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated," provides broader protection than the Fourth Amendment in the context of open fields. *Betchart*, 205 Cal. Rptr. at 136 & n.2 (quoting Cal. Const. art. I, § 13). The court explained that, "[u]nder California law, a claim of illegal warrantless search is measured by a balancing test: 'whether the person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion.'" *Id.* at 136-37 (citation omitted). Focusing on the regulated nature of wild game hunting and how the need for a warrant to search open fields would impede enforcement of game regulations, the court concluded that the landowner's expectation of privacy while hunting on his agricultural range land was unreasonable. *Id.* at 137-39. Consequently, the court concluded that the warrantless entries by fish and game personnel "onto open fields constitute only a minimal intrusion into the private use of the property." *Id.* at 139. The court did, however, express that those warrantless entries could not, absent probable cause, "exceed the specific limited purpose of enforcing wild game regulations." *Id.*

In *Mittleider*, the North Dakota Supreme Court concluded that, while Article I, Section 8 of the North Dakota Constitution, which provides, in germane part, that "[t]he

right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated," may in some instances provide greater protection than that afforded by the Fourth Amendment, such provision "is not implicated unless a reasonable expectation of privacy is invaded." *Mittleider*, 809 N.W.2d at 308 (citation omitted); N.D. Const. art. I, § 8. The court concluded that the "'no trespassing' signs posted around the [landowners'] farmstead did not create a reasonable expectation of privacy in the entrance of the farmstead." *Mittleider*, 809 N.W.2d at 308. The court explained that, "[b]ecause a reasonable expectation of privacy was not invaded," Article I, Section 8 was not implicated and, therefore, it need not consider whether Article I, Section 8 affords North Dakota citizens greater protection than that offered by the Fourth Amendment. *Id.*

Our review of these decisions from our sister states reveals that the constitutions of many of the states that have adopted the open fields doctrine—Nebraska, Indiana, Missouri, Oklahoma, New Jersey, California, and North Dakota—contain language that is virtually identical to that of the Fourth Amendment. More specifically, those states' constitutions refer to "effects," not "possessions." It is, therefore, unremarkable, for the purposes of our analysis, that those states have adopted the federal open fields doctrine *in toto*. What is remarkable is that three states—Oregon, New York, and Montana—have rejected the federal open fields doctrine under their own state charters, despite the fact that language in their state charters that protect from unreasonable searches and seizures mirrors that of the Fourth Amendment. One additional state—Washington— whose constitution contains language that is unlike both the Fourth Amendment and Article I, Section 8, has also rejected the open fields doctrine on the basis that its constitution provides heightened privacy protection to its citizens.

With respect to states with provisions that mirror Article I, Section 8, in particular the use of the word "possessions," the results are mixed. Three of those states—Mississippi, Tennessee, and Vermont—have rejected the open fields doctrine after concluding that the term "possessions" includes land over which the landowner has exercised some degree of control. Four—Kentucky, Michigan, New Hampshire, and Texas—have adopted the open fields doctrine. Importantly, however, we respectfully disagree with the approach taken by the Kentucky Court of Appeals in *Brent*, which this Court later emulated in *Russo.* In *Brent*, the Kentucky Court of Appeals applied the *ejusdem generis* canon of statutory construction to conclude that the term "possessions" as used in Section 10 of Kentucky's Constitution means "the intimate things about one's person," which does not include land located outside of the curtilage. *Brent*, 240 S.W. at 48. In so doing, however, the Kentucky Court of Appeals failed to consider first the original meaning of the term "possessions." As noted above, *ejusdem generis* is a tool of statutory construction to be used to suss out legislative intent, not to ignore the words themselves. We can also distinguish the decision from another of those states—Texas—due to its focus. In concluding that the warrantless entry onto open fields did not offend Article I, Section 9 of the Texas Constitution, the Texas Court of Criminal Appeals focused, not on defining the term "possessions," but, rather, on whether the search itself was unreasonable.

After considering these decisions from other jurisdictions, and given Pennsylvania's history of providing heightened privacy protection to its citizens, as detailed above, we find ourselves more persuaded by the decisions from those jurisdictions that have chosen to reject the federal open fields doctrine and, instead, to provide greater protection than that offered by the Fourth Amendment to landowners that exercise at least some control over their land located outside of the curtilage. For these

reasons, we conclude that case law from other jurisdictions, like Article I, Section 8's text and history, supports an interpretation of Article I, Section 8 that is broader than the Fourth Amendment with respect to Pennsylvania citizens' privacy rights as they relate to open fields. We, therefore, turn to the last prong of the *Edmunds* analysis and consider relevant Pennsylvania policy considerations.

### d. Policy Considerations

To complete our *Edmunds* analysis, we examine relevant policy considerations, particularly those of state and local concern within the Commonwealth and how they apply within modern Pennsylvania jurisprudence. The Commission and Warden Gritzer, similarly to this Court in *Russo*, focus on a singular policy consideration: the open fields doctrine, and more specifically the Entry Statutes, enable the Commission to fulfill its duty under the ERA to conserve, maintain, and protect wildlife. We agree with this Court's statement in *Russo* that "[t]he citizens of this Commonwealth throughout our history have shown a keen interest in protecting and preserving as an asset the diverse wildlife that find refuge in the fields and forests within our borders," which interest ultimately resulted in the ERA. *Russo*, 934 A.2d at 1212. We also agree with the Commission, Warden Gritzer, and, significantly, the Hunting Clubs that the ERA permits the Commission and its officers to enforce the Code. We disagree, however, with the *Russo* Court's conclusion that "any subjective expectation of privacy against governmental intrusion in open fields is not an expectation that our society has ever been willing to recognize as reasonable" and the Commission and Warden Gritzer's contention that "a rule prohibiting warrantless searches of open fields in the hunting context would place [Article I,] Section 8 on a collision course with the [ERA]." *Id.* at 1213; (Commission and Warden Gritzer's Br. at 36-37).

Instead, we, like Chief Justice Cappy in his dissent in *Russo*, believe that a balance must and can be achieved between the interest in protecting, preserving, and maintaining wildlife under the ERA and the interest in protecting our citizen's privacy rights guaranteed by Article I, Section 8. *See Robinson Twp.*, 83 A.3d at 946 ("[B]ecause the [Pennsylvania] Constitution is an integrated whole, we are cognizant that effect must be given to all of its provisions whenever possible."). Recognition of a protected privacy interest in private land located outside the curtilage over which the landowner has taken steps to exclude others therefrom will not, as the Commission and Warden Gritzer suggest, unreasonably impede their ability to effectuate their duty under the ERA to conserve, protect, and maintain wildlife.[22] The Commission's officers will still be permitted to: (1) conduct warrantless searches of private property that is not posted, fenced, or otherwise marked to exclude intruders; (2) observe evidence of Code violations that occur in plain view on private property that is posted, fenced, or otherwise marked to exclude intruders; (3) obtain a warrant to search private property that is posted, fenced, or otherwise marked to exclude intruders based upon their receipt of information that a Code violation has occurred;[23] and/or (4) apply a recognized exception to the warrant requirement as a means to search private property that is posted, fenced, or otherwise marked to exclude intruders. While this means that the current balance, as reflected in *Russo*, must shift toward affording greater protection to possessed land and limiting the reach of the federal

---

[22] Furthermore, "we cannot ignore constitutional commands[, including Article I, Section 8,] even if they make the work of police . . . harder." *Alexander*, 243 A.3d at 198.

[23] As then-Justice, now-Chief Justice Todd recognized in her dissent in *Gary*, "not only has our Court steadfastly protected the important right of personal privacy by insisting, through our decisions, on the use of a warrant for searches of all areas in which our citizenry has a reasonable privacy interest, unless not reasonably practicable, we have also purposefully sought to encourage the use of warrants to conduct searches by *making them far easier for police officers to obtain in conducting field investigations*." *Gary*, 91 A.3d at 157 (Todd, J., dissenting) (emphasis added); *see also id.* at 157-59.

open fields doctrine under our state charter, it is the weight and pull of our citizens' privacy rights under our state charter that demands the realignment, not a diminution of the importance of our citizens' right to the conservation, maintenance, and protection of wildlife under the ERA.

Moreover, as to other relevant policy considerations, we agree with the Hunting Clubs that rejection of the open fields doctrine coheres with modern state property claims—*i.e.*, trespass, adverse possession, ejectment, and quiet title—that treat land as a possession. *See Briggs v. Sw. Energy Prod. Co.*, 224 A.3d 334, 346 (Pa. 2020) ("[A] trespass occurs when a person who is not privileged to do so intrudes upon land *in possession of another*, whether willfully or by mistake." (emphasis added)); *City of Phila. v. Galdo*, 217 A.3d 811, 820 (Pa. 2019) ("An individual who claims title by *adverse possession* in Pennsylvania must prove actual, continuous, exclusive, visible, notorious, distinct, and hostile *possession of the land* for a period of twenty-one years." (emphasis added)); *Duncan v. Chartiers Nature Conservancy, Inc.*, 348 A.3d 91, 95 (Pa. 2025) ("[A]n ejectment action lies only when a purported property owner is '*out of possession*' but has 'a present *right to immediate possession*.'" (emphasis added) (citation omitted)); *id.* ("[A] quiet title action is appropriate when 'a party *in possession*' of property seeks to 'test his title as against an adverse claimant[,]' which may be the record title owner." (second alteration in original) (emphasis added) (citation omitted)). We also observe that there is some merit to the Hunting Clubs' arguments that permitting the Commission's officers and other government officials to roam freely and, in some instances, to install cameras on private land that is posted and/or fenced in an effort to exclude intruders: (1) interferes with a landowner's right to freedom of association under Article I, Section 20 due to the potential inability to keep his/her conversations private; and (2) makes it difficult to safely

and responsibly exercise his/her right to bear arms under Article I, Section 21 due to the increased potential for a hunting-related accident.

For all of the above-stated reasons, we conclude that the relevant policy considerations, like Article I, Section 8's history and text and the case law from other jurisdictions, supports an interpretation of Article I, Section 8 that is broader than the Fourth Amendment with respect to the expectation of privacy that Pennsylvania citizens enjoy relative to their open fields.

### e. Conclusion

Based on the foregoing *Edmunds* analysis, we conclude that *Russo* was wrongly decided because the text of Article I, Section 8; its history of providing enhanced privacy rights; case law from other jurisdictions, including those with similar constitutional provisions and that share Pennsylvania's commitment to protecting privacy; and relevant policy considerations all support interpreting Article I, Section 8 as affording greater protection than the Fourth Amendment in the context of open fields.  In light of that conclusion, and our conclusion that our respect for *stare decisis* is not a bar in this case to reconsidering *Russo*, we hereby overrule *Russo* and consider whether the Entry Statutes violate Article I, Section 8.

### C.  Constitutionality of the Entry Statutes

#### i.  Parties' Arguments

The Hunting Clubs argue that the Entry Statutes violate Article I, Section 8 because they allow the Commission's officers to search private land even when landowners have taken steps to exclude intruders therefrom—*i.e.*, by posting "no trespassing" signs, marking boundaries with purple paint, and installing gates at every entrance—without a warrant, probable cause, or the existence of a recognized exception to the warrant requirement.

The Commission and Warden Gritzer, on the other hand, argue that the Hunting Clubs have failed to demonstrate that the Entry Statutes clearly, plainly, and palpably violate Article I, Section 8. In support, they first contend that, to the extent that the Hunting Clubs rely on *Ickes* to support their constitutional challenge, such reliance is misplaced because *Ickes* involved a statute that "require[d] an individual to provide a game officer with identifying information upon demand even if that individual had not been lawfully subjected to an investigatory detention under *Terry v. Ohio*, 392 U.S. 1 (1968)," whereas the Entry Statutes do not permit the seizure of persons but, rather, allow the Commission's officers to enter private land. (Commission and Warden Gritzer's Br. at 41-42.) The Commission and Warden Gritzer then claim that, in light of this Court's decision in *Russo*, the Entry Statutes do not violate Article I, Section 8 because they "merely authorize game officers to enter open fields without penetrating 'buildings' or 'curtilage.'" (*Id.* at 43.) The Commission and Warden Gritzer further contend that the Hunting Clubs waived any separate or distinct challenge to the constitutionality of Section 901(a)(8) of the Code for failing to develop any meaningful argument in their brief relative to that specific provision. They, nevertheless, offer reasons why they believe that Section 901(a)(8), by itself, does not violate Article I, Section 8.

In reply, the Hunting Clubs argue that if *Russo* is overruled, the Entry Statutes cannot stand because they permit "classic" unreasonable searches. (Hunting Clubs' Reply Br. at 20.) The Hunting Clubs indicate that they are not certain what the Commission and Warden Gritzer mean when they say that the Hunting Clubs waived any separate and distinct challenge to Section 901(a)(8) of the Code because they challenged that statute for the same reason that they challenged Sections 303(c) and 901(a)(2)—*i.e.*, it authorizes a warrantless search of their landed "possessions" in violation of Article I, Section 8.

*ii. Analysis*

"The constitutionality of a statute is a pure question of law, over which our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Hunte*, 337 A.3d 483, 497 (Pa. 2025) (citing *Commonwealth v. Torsilieri*, 316 A.3d 77, 86 (Pa. 2024)). Statutes enjoy a presumption of constitutionality, and challengers bear the heavy burden of demonstrating that their provisions "clearly, plainly, and palpably" violate the Pennsylvania Constitution. *Id.* (quoting *Pa. Env't Def. Found. v. Commonwealth*, 279 A.3d 1194, 1202 (Pa. 2022)). "A statute is facially unconstitutional only where no set of circumstances exist[s] under which the statute would be valid." *Commonwealth v. Pownall*, 278 A.3d 885, 904 (Pa. 2022) (quoting *Clifton v. Allegheny Cnty.*, 969 A.2d 1197, 1222 (Pa. 2009)). By contrast, a statute is unconstitutional as applied when "its application to a particular person under particular circumstances deprived that person of a constitutional right." *Commonwealth v. Shifflett*, 335 A.3d 1158, 1165 (Pa. 2025) (quoting *Martin v. Donegal Twp.*, 325 A.3d 502, 509 (Pa. 2024)).

Sections 303(c) and 901(a)(2) of the Code unquestionably permit the Commission's officers, employees, and representatives to enter private land, posted or otherwise, outside of buildings and curtilage without a warrant to inspect for violations of the Code. Thus, in order to determine whether those statutory provisions are unconstitutional, either facially or as applied to the Hunting Clubs, we must consider to what extent the protections afforded by Article I, Section 8 apply to open fields. It is not enough to simply conclude that Article I, Section 8 affords greater privacy protection than the Fourth Amendment in this context. Rather, we must set forth the scope of the privacy protection applicable to a landowner's open fields. "In determining the scope of protection afforded under Article I, Section 8, this Court employs the same two-part test employed by the . . . Supreme Court to determine the sweep of the [Fourth Amendment]—a test first

articulated by Justice Harlan in his concurring opinion in *Katz*." *Commonwealth v. Duncan*, 817 A.2d 455, 463 (Pa. 2003). "That test requires a person to (1) have exhibited a subjective expectation of privacy and (2) have demonstrated that the expectation is one that society is prepared to recognize as reasonable and legitimate." *Gordon*, 683 A.2d at 256.

There is no question that the Hunting Clubs have exhibited a subjective expectation of privacy in their land located beyond the curtilage. They have posted their properties' boundary lines with clearly visible "no trespassing" signs and purple paint, installed locked gates at all public entrances, and fenced some of their properties' boundaries with waist-high, metal wire, all in an effort to exclude non-members and intruders therefrom. Additionally, Punxsutawney planted evergreen trees along the public road that runs through its land to create a "screen" as a means to prevent non-members from looking or shooting into its property from the public road. Moreover, the Hunting Clubs only permit entry onto their properties by members, their members' guests, contractors who help maintain their properties, and a gas company that owns the subsurface mineral rights to their properties and that accesses its well pad through a defined access trail. Collectively, these efforts demonstrate that the Hunting Clubs, at least subjectively, expect that the privacy of their members will be protected when those members are present on the Hunting Clubs' private land, including their open fields.

The more pertinent question is whether society is prepared to recognize the Hunting Clubs' subjective expectation of privacy in their land as reasonable. To answer that question, we must first make an important distinction. Truly open fields—*i.e.*, private land that is unposted and unbounded—is fundamentally different in kind than private land conspicuously posted with "no trespassing" signs and purple paint and/or bounded by fences, gates, and other structures. With respect to the former, the landowner has made

absolutely no attempt to exclude intruders and/or to advise the public that the land is indeed private, whereas, with respect to the latter, the landowner has taken steps to notify the public that the land is private and that they should not intrude thereon without permission. We believe that society is both prepared and willing to protect a landowner's expectation of privacy in his/her affairs conducted on his/her private land located beyond the curtilage as reasonable and legitimate when such landowner has taken sufficient steps to notify members of the public that the land is private and that they should not trespass thereon.

We, therefore, conclude that the scope of the protection afforded under Article I, Section 8 to a landowner's open fields extends to private land located beyond the curtilage over which the landowner has demonstrated a reasonable and legitimate expectation of privacy by taking sufficient steps to exclude intruders therefrom. Government officials, therefore, must obtain a warrant based upon probable cause or satisfy one of the recognized exceptions to the warrant requirement before entering the private land of any landowner that has taken such steps. As Sections 303(c) and 901(a)(2) of the Code permit the Commission's officers, employees, and representatives to enter private land, posted or otherwise, outside of buildings and curtilage without a warrant, probable cause, and/or satisfying one of the recognized exceptions to the warrant requirement to inspect for violations of the Code, the Hunting Clubs have met their heavy burden of establishing that such statutory provisions clearly, plainly, and palpably violate Article I, Section 8.[24]

---

[24] In his concurring and dissenting opinion, Justice Wecht expresses his belief that Article I, Section 8 "embraces a broader privacy entitlement" and that "[l]andowners reasonably may expect that their land is protected against arbitrary and warrantless government entries" irrespective of whether such landowners "adorn[] [their] land with flimsy paper signs or splatters [of] purple paint on a handful of trees." (Concurring and Dissenting Op. at 2 (Wecht, J.).) Justice Wecht premises his conclusion, at least in part, on the Supreme Court's decision in *United States v. Jones*, 565 U.S. 400 (2012), which, according to Justice Wecht, held "that there are two ways to invoke the protections of the (continued…)

While we are always reluctant to strike down a statutory provision as facially unconstitutional, we cannot contemplate any circumstance under which Sections 303(c) and 901(a)(2) would be valid under our decision today.[25]  *See Hunte*, 337 A.3d at 517-18.

Fourth Amendment:"  (1) "[a] person can demonstrate an expectation of privacy in the area searched;" or (2) "a person can invoke a trespass theory, which affords the right to challenge a search or seizure when a government agent 'physically occupied private property for the purpose of obtaining information.'"  (*Id.* at 2 n.5 (quoting *Jones*, 565 U.S. at 404-05).)  Justice Wecht reasons that, "[b]ecause the Entry Statutes authorize such a trespass, they likely are unconstitutional under *Jones* and the Fourth Amendment, as well as under Article I, Section 8."  (*Id.*)  This conclusion, however, ignores that a person cannot be convicted of defiant or agricultural trespass in Pennsylvania unless he/she enters or remains on property where notice against trespass has been given by, *inter alia*, posting in a manner that is reasonably likely to inform potential intruders that entry is prohibited or fencing/enclosures that are designed to exclude intruders.  *See* 18 Pa. C.S. § 3503(b), (b.2).

Additionally, we cannot ignore that this case is about rural, undeveloped land, not a suburban one-acre plot or a nine-acre tract of land upon one acre in the center of which sits a swimming pool.  There may be ways by which the owners of those latter two properties can demonstrate a reasonable and legitimate expectation of privacy that does not involve marking the boundaries of their properties with "no trespassing" signs or purple paint.  We resolve only the question of whether the Hunting Clubs here have done so.  In other words, we reserve for another day the question of whether the privacy protections afforded by Article I, Section 8 extend to landowners who have taken fewer steps than the Hunting Clubs, or even no steps, to exclude intruders from their properties.

[25] In her concurring and dissenting opinion, Chief Justice Todd rejects our conclusion that Sections 303(c) and 901(a)(2) of the Code are facially unconstitutional and, instead, would hold that such provisions are "unconstitutional only as applied to the facts of this case" because, in her view, "there are circumstances under which the provisions may be constitutionally applied"—*i.e.*, where the Commission's officers, employees, and representatives enter onto unposted land.  (Concurring and Dissenting Op. at 1 (Todd, C.J.) (emphasis omitted).)  To reach this conclusion, Chief Justice Todd looks past the fact that Sections 303(c) and 901(a)(2) expressly allow entry onto *all* land, unposted *and posted*.  To save Sections 303(c) and 901(a)(2) from facial invalidity, Chief Justice Todd rewrites those provisions, severing the express authority to enter *posted* land.  By doing so, Chief Justice Todd proves the point.  Sections 303(c) and 901(a)(2), as written, are unconstitutional on their face.  *See Holland v. Marcy*, 883 A.2d 449, 456-57 (Pa. 2005) ("This Court may not amend the statute but instead must examine the statute as drafted by the legislature.").  Because Chief Justice Todd fails to explain how Sections 303(c) and 901(a)(2), as written, can be applied constitutionally to both unposted and posted land, we stand by our conclusion that the statutes are facially unconstitutional.

(continued…)

The same, however, cannot be said with respect to Section 901(a)(8) of the Code. Unlike the provisions of the Code we strike down today, there is nothing in the text of Section 901(a)(8) that permits the Commission's officers, employees, and representatives to enter private land, posted or otherwise. While our decision today may certainly impact how the Commission's officers, employees, and representatives perform "administrative inspections," the Hunting Clubs have not presented us with a compelling enough argument to conclude that the provision could not be applied in a constitutional fashion. In short, the Hunting Clubs have not demonstrated that Section 901(a)(8) clearly, plainly, and palpably violates Article I, Section 8.[26]

---

We also considered whether any portions of Sections 303(c) and 901(a)(2) of the Code could be saved under a severance analysis. *See* Section 1925 of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1925. Nonetheless, we concluded that there does not appear to be any invalid language that we can sever and that would yield operative and constitutional text consistent with the legislative intent behind the enactment of these provisions of the Code. Accordingly, the provisions fall in their entirety.

[26] The Commonwealth Foundation, which, as stated previously, filed an *amicus* brief in support of the Hunting Clubs' position in this matter, adds that, even if this Court continues to recognize the open fields doctrine, Section 901(a)(8) of the Code is still unconstitutional because it "grants an officer the power to conduct searches[—*i.e.*, "administrative inspections"—]that are forbidden under normal search and seizure jurisprudence." (Commonwealth Foundation's Br. at 22.) We will not consider the Commonwealth Foundation's claim, which the Hunting Clubs have not sufficiently developed in this appeal. *See Commonwealth v. Cotto*, 753 A.2d 217, 224 n.6 (Pa. 2000) ("An *amicus curiae* is not a party and cannot raise issues that have not been preserved by the parties."). To be clear, in this matter, we are rejecting the Hunting Clubs' constitutional challenge to Section 901(a)(8) of the Code. We are not declaring that section constitutional, although it is presumptively so until a court decides otherwise. *See Hunte*, 337 A.3d at 497 ("Statutes enjoy a presumption of constitutionality . . . .").

In his concurring and dissenting opinion, Justice Wecht expresses his belief that Section 901(a)(8) of the Code authorizes the Commission's officers, employees, and representatives "to enter private land and search nearly any person, place, item, or container located on the property, all without a warrant or even the barest suspicion of illegal activity," "[s]o long as [those] officer[s, employees, and representatives] believe[] that someone is hunting." (Concurring and Dissenting Op. at 11 (Wecht, J.).) We disagree and reiterate that there is simply nothing within the text of Section 901(a)(8) that expressly permits such an entry onto private land.

### III. CONCLUSION

For all of the foregoing reasons, we hold that *stare decisis* does not compel our adherence to *Russo*, that *Russo* was wrongly decided, and that Sections 303(c) and 901(a)(2) of the Code violate Article I, Section 8 of the Pennsylvania Constitution. In so doing, we further hold that Article I, Section 8 provides Pennsylvania citizens with greater protection than the Fourth Amendment to the United States Constitution as it relates to the open fields of any landowner that has demonstrated a reasonable expectation of privacy by taking sufficient steps to exclude intruders therefrom. Accordingly, the Commission's officers, employees, and representatives, as well as any other government officials, must obtain a warrant based upon probable cause or satisfy one of the recognized exceptions to the warrant requirement before entering such property. For these reasons, we reverse the Commonwealth Court's order.[27]

Justices Donohue, Dougherty and Mundy join the opinion.

Justice Donohue files a concurring opinion.

Justice Mundy files a concurring opinion.

Chief Justice Todd files a concurring and dissenting opinion.

Justice Wecht files a concurring and dissenting opinion in which Justice McCaffery joins.

---

[27] In light of our conclusions, we need not remand this matter to the Commonwealth Court because, by striking down Sections 303(c) and 901(a)(2) of the Code as violative of Article I, Section 8, this Court has essentially granted the Hunting Clubs the declaratory and injunctive relief that they sought in their Petition and their application for summary relief.